# CHARLESTON.

RAILROAD COMPANY *v.* IRON-WORKS.

Submitted June 23, 1888.—Decided December 15, 1888.

1. EMINENT DOMAIN—CONDEMNATION OF PROPERTY TO PUBLIC USE.
   Whether the use, to which property sought to be taken under the exercise of eminent domain is public or private, is a judicial question subject to review by the appellate court. (p. 718.)

2. EMINENT DOMAIN—CONDEMNATION OF PROPERTY TO PUBLIC USE —EVIDENCE.
   Evidence, that all, who wish to avail themselves of the proposed switch, branch-road or lateral work, can do so, is not sufficient to show, that the use of the work will be for the benefit of the public. (p. 735.)

3. EMINENT DOMAIN—CONDEMNATION OF PROPERTY TO PUBLIC USE —PROPERTY OF RAILROAD COMPANIES.
   The property of railroad corporations, so far as concerns the ownership thereof and the profit to be made from its use, is to all intents and purposes private property, although applied to a use in which the public have an interest. (p. 734.)

4. EMINENT DOMAIN—CONDEMNATION OF PROPERTY TO PUBLIC USE— RAILROAD CORPORATIONS—PROPERTY OF RAILROAD COMPANY.
   Where railroad corporations seek by the exercise of the right of eminent domain to take private property for public use, the public is concerned ; but as to their private interests—their property and profits—they stand as individuals or merely as private corporations, in which the public has no concern ; and for the benefit of such private interests the right of eminent domain can not be invoked. (p. 734.)

5. EMINENT DOMAIN—CONDEMNATION OF PROPERTY TO PUBLIC USE —SWITCH TO MANUFACTORY.
   Where a railroad corporation sought to condemn land, over which to build a switch, branch-road or lateral work to reach a private manufactory, a steel mill, for the purpose of transporting freight to and from said steel-mill over petitioner's road, *held*, the use, to which the land was to be subjected, was a private not a public use. (p. 735.)

*Caldwell & Caldwell* for Iron-Works, plaintiff in error.

*Ewing, Melvin & Riley* for Benwood, plaintiff in error.

*W. P. Hubbard* for defendant in error.

JOHNSON, PRESIDENT:

This is a condemnation proceeding. The plaintiff is a domestic corporation, incorporated by chapter 54 of the Acts of the Extra Session of the Legislature of 1868 under the name of the " Pan Handle Railroad Company," " for the purpose of constructing a railroad from Holliday's Cove in Brooke county to the town of Wellsburg and thence to the city of Wheeling." By the second section it was declared that said company should " be subject to all the provisions and entitled to all the benefits now conferred by law upon internal improvement companies, * * * and especially to the provisions of chapters fifty six, fifty seven and sixty-one of the Code of Virginia." By chapter 77 of the Acts of 1869 it was authorized "to extend its road from the city of Wheeling in the direction of the Kentucky State line, through such sections of the State contiguous to the Ohio river as said company may deem most desirable." By chapter 52 of the Acts of 1871, the corporation name was changed to the "Pittsburg, Wheeling & Kentucky Railroad Company."

By section 5 of chapter 61 of the Code of 1860 it is provided, that "the president and directors of any company incorporated to construct a railroad or other work of internal improvement may cause to be made in connection therewith branch railroads or lateral works not exceeding two miles in length; and, under a resolution adopted in general meeting by two thirds of all the votes of all the stockholders may cause to be made branch railroads or lateral works not exceeding ten miles in length." Section 69 of chapter 54 of the Code of West Virginia 1887 provides, that "any railroad company organized under this chapter may build and construct lateral and branch roads or tramways and of any gauge whatever not exceeding fifty miles in length." By section 67 of the same chapter it is provided, "that all existing railroad corporations within this State shall respectively have and possess all the powers and privileges and be subject to all the duties and liabilities' and provisions contained in this chapter."

On the 29th day of October, 1886, the plaintiff tendered its petition to the Circuit Court of Marshall county alleging, that it had constructed its railroad to Benwood in Marshall

county; that "recently and since the construction of said railroad a corporation known and called the 'Wheeling Steel-Works Company' has erected a steel-plant or works in the said city of Benwood in said county, which plant lies next east of the Benwood Iron-Works. Said Steel-Company produces large quantities of steel and consumes large amounts of material, and your petitioner's said road is now unable to transport any of said steel or material by reason of its having no track reaching to or into said steel-works. In order to reach said steel-works, by a track or switch leading from its said main track, your petitioner avers it is necessary to take certain lands hereinafter fully described. Said switch or track is to be constructed for the purpose of transporting freights to and from said steel-works over your petitioner's said railroad."

The description of the first lot sought to be taken is as follows: " Beginning at a point in the southern line of a street parallel to, and 276½ feet distant northerly from, the Benwood Nail Factory,—said point being 125 feet westwardly from the west line of Second street, in said city of Benwood; running thence in a southerly direction, on a curved line to the left, having a radius of 350 1-10 feet, parallel to, and eight feet distant eastwardly from, the centre line of the side track leading from the main track of the Pittsburg, Wheeling & Kentucky Railroad into the Wheeling Steel-Works, a distance of three feet; thence, on a reversed curved line to the right, having a radius of 366 1-10 feet, still parallel and eight feet distant eastwardly from said side track, a distance of 233½ feet, to the said west line of Second street; thence by said line of said street south, 20 degrees and 42 minutes west, 28 feet, to a line parallel to, and 60 feet distant north-westerly from, said Benwood Nail Factory; thence by said line north, 69 degrees and 18 minutes west, 34 feet; thence, on a curved line to the left, having a radius of 326 1-10 feet, parallel to, and 32 feet distant westwardly from, the said side track, a distance of 224 3-10 feet; thence on a reversed curved line to the right, having a radius of 390 1-10 feet, a distance of 52 2-10 feet to the southern line of the first-mentioned street; thence by said line of said street south 69 degrees and 18 minutes east 62½ feet, to the place of beginning,—

containing an area of twenty four one hundreths of an acre more or less."

The second parcel is also described in like manner and contains an area of nineteen one-hundreths of an acre. A plat is exhibited with the petition, which shows the exact location of the land sought to be taken and is made a part of the petition.

The petition shows, that the whole of the first parcel of land is owned by the Benwood Iron-Works, a corporation under the laws of West Virginia engaged in the manufacture of iron and nails; that there are no liens on said parcels of real estate, which lie open and unused with no buildings or other improvements thereon; that the petitioner is unable to agree with said Benwood Iron-Works in relation to the price of said parcel of land, the said company refusing to sell it for any price; and that said parcel of land is necessary for the construction of petitioner's said track. The petitioner avers, that the second parcel of land is partially claimed by different persons. The north 60 feet is claimed by Mrs. Hannah McMechen, H. B. McMechen and Eliza McMechen Mayes, as the devisees in fee of the late Hiram McMechen, while at the same time the Benwood Iron-Works claims to be the owner thereof in fee, and the city of Benwood claims, that it constitutes a part of one of the public streets of the city; that the remainder of said parcel of land is claimed in fee by the Benwood Iron-Works.

Notice was served on the parties, and the petitioner prayed the court to appoint commissioners to ascertain the just compensation to the parties owning said parcels of land sought to be taken, etc.

The plat shows, that to reach said steel-works the switch would have to cross two streets of the city of Benwood diagonally cutting the vacant lot, and passing along Second street, and partly on the land of the Benwood Iron-Works, and between two buildings of the iron-works.

When the petition was presented, the city of Benwood appeared and objected to the filing of the petition; but the court overruled the objection and permitted the same to be filed. On the 7th of April, 1887, on demurrer to said petition the court held, " that the use set forth in the petition, to which

90

the track of the railroad is to be put, for which the lands are sought to be condemned, are not public uses, and the prayer of the petitioner should be denied." Whereupon the petitioner asked leave to amend its petition, to which the Benwood Iron-Works and the city of Benwood objected, but the objections were overruled, and the leave was granted. On the 29th day of June, 1887, the petitioner tendered its amended petition in pursuance of the leave granted by the court. The city of Benwood and the Benwood Iron-Works filed their objections in writing to the filing of said amended petition, and the city of Benwood filed its demurrer in writing to said petition, and said objections and demurrer were argued and taken under consideration by the court, and the court overruled the objections and the demurrer and permitted the petition to be filed, and notice was ordered to be given those defendants who had not appeared. The description of the property and the lines of the side-track in the amended petition are substantially the same as set out in the original petition, and the amended petition is accompanied with the same plat.

The only material difference in the two petitions is the declaration of the purpose, for which said side-track, called in the amended petition a " branch railroad and lateral work," is to be used. In the amended petition it is alleged, " that the railroad so constructed is now owned by your petitioner and is used and operated for the transportation of passengers and freight under and in accordance with the laws of the State of West Virginia and for all the public uses imposed upon railroads by such laws. Your petitioner now desires and intends in accordance with law and in the exercise of the further authority conferred upon it by its charter and the laws of this State to build and construct a branch railroad and lateral work, not exceeding two miles in length, from a point on its main line in the city of Benwood and some distance north of the nail factory of the Benwood Iron-Works to a point opposite and west of the southern end of the steel-mill of the Wheeling Steel-Works, also in the city of Benwood. The branch railroad and lateral work so to be constructed by your petitioner is to be a public highway and free to all persons for the transportation of their

persons and property thereon under such regulations, as may be prescribed by law, and is to be for public use."

The city of Benwood answered, denying the right of the petitioner to condemn its street or a part thereof for the purpose of building a switch to the works of a private corporation, setting out the streets that would be invaded, and showing what inconvenience would result to the city. This answer also shows, that Second street is now partially obstructed by a railroad track constructed to the Wheeling Steel-Works from the track of the Ohio River Railroad, over which road the petitioner has the right to pass and does pass to and take and unload freight at the Wheeling Steel-Works, and that the further obstruction of the street, as proposed, would render it valueless and impassable as a public highway, which is necessary and indispensable for the city. To this answer the petitioner objected.

The objections of the Benwood Iron-Works to the filing of the amended petition are in substance, that it is insufficient in law and does not show, that the lands sought to be taken are to be condemned for a public use within the meaning of the constitution of this State; that the uses, for which the said lands are sought to be taken, as stated in the original petition, did not constitute a public use, and the amended petition only sets forth in more general language the uses, for which the lands are sought to be taken, and does not use any language, which is inconsistent with the proposed railroad being used solely for the uses set out in the original petition; and that the amended petition, including its exhibits, is inconsistent with itself, *etc.*

The Benwood Iron-Works filed its answer, to which the petitioner objected. . This answer alleges, that the Iron-Works was applied to a short time before July, 1886, by C. D. Hubbard, president of the petitioner, to ascertain on what terms it would sell to the railroad company the right of way through its grounds; that the matter was laid before the board of directors of the Benwood Iron-Works, and the board refused to sell at any price, because it had been for a long time and was still reserving said ground for the purpose of erecting thereon a blast-furnace. It avers, that the Wheeling Steel-Works induced the petitioner to ask to have the

·lands condemned; that since the filing of the original petition the Wheeling Steel-Works has bought from the Benwood Iron-Works the ground south of the main works, on which to stand and shift cars laden with freight consigned to or by that corporation; that the petition, though nominally that of the railroad company, is really that of the Steel-Works; that said purpose is revealed in the original petition, as follows: " Said switch or track is to be constructed for the purpose of transporting freights to and from the said steel-works; " that this is not a purpose useful to the public, but to the steel-works; that it is still true, as stated in the original petition, that the Wheeling Steel-Works has erected a steel-plant or works in the city of Benwood next east of the Benwood Iron-Works, while petitioner's main track lies west of the said Benwood Iron-Works; that said steel-company produces large quantities of steel and consumes large amounts of material; and that said switch or track is to be constructed for the purpose of transporting freights to and from said steel-works over petitioner's road. It denies that the switch, track, railroad and lateral work mentioned in the amended petition is to be a public highway, and free to all persons for the transportation of their persons and property thereon under such regulations as may be prescribed by law, and that it is for public use, *etc.*

On the 18th day of November, 1887, the parties came *etc.*: " and the court, having maturely considered the answers heretofore tendered by the Benwood Iron-Works and the city of Benwood to the amended petition herein, and having also considered the objections heretofore made by said answers, and argued by counsel; and the court, being of opinion that nothing alleged in said answers constitute a bar to the appointment of commissioners, to ascertain a proper compensation for the land sought to be taken, except so much of the answer of the Benwood Iron-Works as denies that the branch or lateral work mentioned in the amended petition is to be a public highway, and free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law, and that it is to be for public use, and also so much as avers that the said amended petition, though nominally that of the

railroad company, is really that of the Wheeling Steel-Works Company,—doth overrule the objection to these parts of the answer of the Benwood Iron-Works, and doth sustain all the other objections of the petitioner; and the petitioner now replying generally to the averments of the answer of the Benwood Iron-Works as to which the petitioner's objections were overruled, and issue being joined, upon the matters alleged in the petition and so much of the answer as remains, it is ordered that testimony on that issue be taken by depositions," *etc.*

On the 11th day of February, 1888, the matter came on to be further heard " upon the issue joined on so much of the answer of the Benwood Iron-Works as denies," *etc.*, stating it; upon the depositions of the witnesses C. D. Hubbard, J. M. Beville, Alonzo Loring and A. N. Wilson with the exhibits therewith, and upon the original entries in the minute book of the board of directors of the Benwood Iron-Works, copies whereof were filed with the depositions, *etc.;* and upon the acts of the legislature, to wit, the act of incorporation, passed July 15, 1868, the act of March 1, 1869, permitting the extension of the road, and the act of February 16, 1871, changing the name of the corporation to what it now is; upon consideration of which the court found for the petitioner on the issues joined; and thereupon it was considered by the court that proper notice had been given, and that the said petitioner has lawful right in this proceeding to take for the purposes stated in the amended petition, the several parcels of land in its said amended petition mentioned and described, and for such purposes to acquire title to said parcels upon just compensation; to which ruling and judgment of the court the defendant, the Benwood Iron-Works, excepted, and tendered its bill of exceptions thereto, and asked that the same might be signed and sealed by the court and made a part of the record therein, which was accordingly done. The court then proceeded to appoint the commissioners. To this order the Benwood Iron-Works obtained a writ of error and *supersedeas.*

The main question to be decided is : Was the use, to which the lands sought to be condemned were to be put, a public use? If not, then of course the lands could not be

legally condemned under the law of eminent domain. If the use were public, then it matters not that the Benwood Iron-Works had for twenty years reserved its lot for the purpose of building a blast-furnace thereon. It could be taken for public use, and the loss to the Co. could be compensated in damages. The question here is not one of compensation, but it is whether the petitioner had a right to take the property. It of course has no right to take private property for private use, but it has the right to take private property for public use on paying a just compensation therefor. The right to take, which depends upon whether it is to be taken for public or private use, is a judicial question, and the decision of the Circuit Court on that question is subject to review. *Railroad Co.* v. *Railroad Co.*, 17 W. Va. 812.

There were issues made in the case, and evidence taken thereon. One of these issues—whether the Wheeling Steel-Works was not in fact the real party asking for the condemnation—was properly decided in the negative. I am unable to perceive the necessity of the issue as to whether the use, to which the property was to be devoted, was public, as it seems to me, that that question might have been decided from the face of the petition and the exhibits filed therewith.

Another issue was, whether the road or switch was to be a public highway and free to all persons for the transportation of their persons and property thereon. The evidence on this subject is short, and I will give the substance of it. The Wheeling Steel-Works is a corporation, whose stock is owned, and which was built, by three other corporations, to wit, the defendant, the Benwood Iron-Works, the Wheeling Iron & Nail Company and the Belmont Nail Company. These three companies each furnished three directors to control the Wheeling Steel-Works, as its board of directors. The Steel-Works had had some trouble in making its shipments, but it is not shown that it induced the petitioner to institute condemnation proceedings. C. D. Hubbard, who is the president of the petitioner, and interested in the Wheeling Iron & Nail Company, in his deposition was asked, the purpose, for which the condemnation was sought, as it appears in the original petition, which had been read to him.

"Are not these averments of the original petitioner true, and is not the purpose for which the switch or track is proposed to be constructed correctly set forth in the original petition?"

He answered—"I think they are substantially true; we have no track of our own and are subject to the courtesy of two different railroads to get there, and to pass over part of the Ohio River Railroad and part of the Baltimore & Ohio Railroad, and are liable at any time to be shut out by either railroad,—that is, the Ohio River or the B. & O."

*Question.* "How much of the Ohio River road did you have to run over after leaving the southern end of the Pittsburg, Wheeling & Kentucky Railroad before your cars would strike the Wheeling Steel-Works' track after it crossed the B. & O. road?"

*Answer.* "I cannot say how much of the main line of the Ohio River R. R. we have to pass over, but sufficient to enable us to get onto the switch by which the Ohio River road connects with the Baltimore & Ohio Railroad, in order to make connection with the track of the Wheeling Steel-Works."

*Q.* "When you were asked whether the averments in the original petition were true, and whether the purposes for which the switch or track proposed to be constructed over the ground the P., W. & Ky. R. R. seeks to condemn in these proceedings were correctly set forth, you said: 'I think they are substantially true.' I ask you to read question 29, now handed you, and state in what respect those averments are not literally true, as applied to the amended petition in these proceedings."

*A.* "I would like to see the original petition. (It was handed to him, and he answered:) "My answer referred mainly to the location of the track, and the closing part of the question, which sets forth the purposes of the track, escaped my attention. The purposes are largely to secure the business of the steel-works. They would be open for the use of any other parties having anything to ship over it, and in that respect my answer was not entirely correct."

*Q.* "What other parties can you suggest would have use for shipping anything over the track laid on the ground now sought to be condemned, except those desiring to transport freight to and from the Wheeling Steel Works?"

*A.* " It could be used by any of the citizens of Benwood,— the Benwood Iron-works, as the track would run between their two nail factories, and we have on the P., W. & Ky. Railroad no other track or siding at Benwood, on which to deliver or receive freight from the citizens of Benwood or others wanting to ship."

*Q.* " Would your company have sought to condemn this ground, except for the purpose of transporting freights to and from the steel-works ?"

*A.* " I think not; it is just in this way: if the steel-works hadn't been there, we should not have thought of building this road to it; just as the main line of the road would not have been built to Wheeling if there had been no Wheeling, —the road being in both cases to secure business."

*Q.* " When you said that your road ' is liable at any time to be shut out from either railroad ' didn't you mean to be shut out from access to the Wheeling Steel-Works ?"

*A.* " Yes, sir. "

On cross-examination this question was asked the witness : " Is this averment in the amended petition true : ' The branch railroad and lateral work to be constructed by your petitioner is to be a public highway, and free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law, and is to be for public use '? "

*A.* " That is my understanding."

Being asked on the redirect, " Are the switches you have spoken of as fully a mile above Benwood, and close to Boggs' run, within the corporation limits of the town of Benwood ?"

*A.* " I think not."

*Q.* " What complaints, if any, have you ever known of from the citizens of Benwood, about there being no convenient place to deliver freight on your road consigned to that town ?"

*A.* " No special complaints have come to my knowledge."

J. M. Belville, the agent of the Pittsburg, Wheeling & Kentucky Railroad at Wheeling, after testifying, on cross examination, as to the difficulty of his road getting freights to and from the Wheeling Steel-Works, in answer to the

question. "Of what use would your company's proposed lateral road be to the general business of the town of Benwood?" said:" It would enable the citizens there to load and unload cars of freight consigned to or coming from them."

*Question.* "What reason is there to suppose it would be of use in that way?"

*Answer.* "We have several times had car-load shipments to and from parties in Benwood other than the Wheeling Steel-Works, and the Benwood Iron-Works, and they could use such a track for that purpose. Our business in Benwood outside of the iron business has increased very much, and the citizens there are demanding better facilities."

*Q.* "What facilities have you now for handling car-load shipments in the general commercial business of Benwood?"

*A.* "We have none, except a siding on ground belonging to the Benwood Iron-Works, and cars for other parties can only be handled on that track through courtesy."

*Q.* "What effect has the want of such facilities had upon the business of your company in Benwood?"

*A.* "I think it has directed business to the B. & O. road which we would otherwise have secured." On the re-direct:

*Q.* "On Exhibit A, now shown you, is not the Benwood Iron-Works' track you have spoken of indicated by the words, 'Siding used by Benwood Iron-Works' and by red lines?"

*A.* "Yes, sir."

*Q.* "Could not a track which would accommodate the car-load trade with Benwood be put on the northerly side of that used by the Benwood Iron-Works?"

*A.* "We could not put in any such siding, for the reason that we have no property at that point available."

*Q.* "Suppose you had the property condemned, how would it be then?"

*A.* "I suppose it would be practicable. I am not enough of an engineer to say positively."

*Q.* "Isn't it level ground there?"

*A.* "The ground is level from a point about sixty feet east of our present main track, and running eastwardly from that."

91

Alonzo Loring, who has been secretary of the Benwood Iron-Works for over twenty-three years, in his deposition says, the Pittsburg, Wheeling & Kentucky Railroad Company has not to his knowledge had a freight agent at Benwood. The business of the Benwood Iron-Works with that company is done in the Wheeling office.

Now what does this evidence amount to? I think, after all has been said, it amounts to this and nothing more: that the lands sought to be condemned are to be used, if condemned, to run a track or tracks to connect with the Steel-Works, said switch, branch-road or lateral work to be constructed for the purpose of transporting freights to and from said Steel-Works over petitioner's road. If this is a public use then the lands should be taken; but, if not, they should not be taken for such purpose. It is insisted by counsel for defendants in error, that such use is public, and he cites to sustain the position *Clarke* v. *Blackmar*, 47 N. Y. 150; *Dietrich* v. *Murdock*, 42 Mo. 284; *Lower* v. *Railroad Co.*, 59 Iowa 563, (13 N. W. Rep. 718); *Dock Co.* v. *Garrity*, 115 Ill. 166, (3 N. E. Rep. 448); *Truesdale* v. *Sugar Co.*, 101 Ill. 561; *Mills* v. *Parlin*, 106 Ill. 60; *Hays* v. *Risher*, 32 Pa. St. 169; *Railroad Co.* v. *Railroad Co.*, 32 N. J. Eq. 765; *Coal Co.* v. *Coal Co.*, 37 Md. 562.

In *Clarke* v. *Blackmar* the court said: "The counsel for the appellant insists that the common council had no power to authorize the streets of the city to be crossed by a railroad track for the benefit of private property or its owners. Be that as it may, it is not this case. The case shows that a very considerable business as common carriers, for a great number of persons, is carried on over this road, both by Grand Trunk and New York Central. * * * The track is not private, but must be regarded as a branch track of the New York Central and Grand Trunk; and the fact that the elevator, in the transaction of its extensive business, is greatly benefited, or that its owners contributed largely to the expense of laying the tracks, does not show it to be private." There is nothing in this case to show, that the use was a merely private one.

In *Dietrich* v. *Murdock*, 42 Mo. 284 it was held, that, where the Legislature in the exercise of its discretion dele-

gated to a railroad company the right of eminent domain, the courts ought not to interfere, except in those cases where it is manifest that private interests alone are to be promoted, and private rights violated, to the extent of taking the property of one individual, and transferring it to another. If by the terms of its charter it was made a public corporation for the use and benefit of that particular section of the State where it was located, and was obliged to furnish the means of transportation, both for passengers and freight, commensurate with its wants, it must be assumed that the grant of authority to the company to condemn the land necessary for its road-bed was a rightful exercise of legislative discretion."

In *Lower* v. *Railroad Co.* it appeared that the company proposed to build a lateral line fifteen miles long. There seemed to be no doubt in this case, and no question, that the use, for which the land was sought to be condemned, was a public use.

In *Dock Co.* v. *Garrity*, 115 Ill. 155, (3 N. E. Rep. 448), bills were filed to enjoin the laying of railway tracks in Illinois street in the city of Chicago. Answers were filed, and the cause was referred to a master to take and report the evidence. The master reported the evidence, and the court enjoined the defendants as prayed. Appeals were prosecuted from these decrees to the appellate court for the First district, where they were affirmed. On appeal to the Supreme Court the decree was reversed. The court held that railroad tracks laid on streets of a city connected with existing railroads and extending to public warehouses, malt houses or manufacturing establishments or to public wharves and landings, are in their nature public and for the public good, and all railroad companies are required by law to permit such connections to be made with their tracks. Mr. Justice Scholfield, in delivering the opinion of the court, said :

" It is not claimed that the use of the streets can be permanently granted for private purposes, and we recognize as unquestionable law that the use of the streets, whether for vehicles drawn by animals, for those riding upon animals, for footmen, or for the passage of railway cars, must be for the public, and that no corporation or individual can acquire an

exclusive right to their use, or the use of any part of them, for private purposes. But we have held that there may be a grant to private individuals of the right to lay tracks in the streets connecting with public railway tracks previously laid, and extending to the manufacturing establishments of those laying the tracks ; but in such cases the tracks so laid become in legal contemplation, to all intents and effects, tracks of the railway, with which they are connected open to the public use and subject to the public control, in all respects as other railway tracks open to public use. We have not regarded the circumstances, that they were laid with private funds, and that they terminated opposite to or within convenient contiguity of a private manufacturing establishment, as materially affecting them, and as giving a private character to their use. All *termini* of tracks and switches are more or less beneficial to private parties, but the public character of the use of the tracks is never affected by this. If they are open to the public use indiscriminately, and under the public control to the extent that railroad tracks generally are, they are tracks for public use. It may be in such cases that it is expected, or even that it is intended, that such tracks will be used almost entirely by the manufacturing establishment, yet if there is no exclusion of an equal right of use by others, and this singleness of use is simply the result of location and convenience of access, it cannot affect the question. *Truesdale* v. *Sugar Co.*, 101 Ill. 561 ; *Mills* v. *Parlin*, 106 Ill. 60."

It is true, as stated in the brief of counsel for defendant in error, that " in Pennsylvania the acts known as ' lateral railroad acts,' which authorize the owners of mills and coalmines to condemn land necessary for the construction of lateral railroads from their mills or mines to a railroad or other line of public transportation, have always been held constitutional. This ruling was originally put by Chief Justice Gibson on the ground that the constitution of Pennsylvania did not expressly forbid the taking of private property for private use." Gibson, C. J., in the first case that arose on the subject (*Harvey* v. *Thomas*, 10 Watts. 63,) said :

"The most material point in the cause is that which involves the constitutionality of the statute on which the defendant's right is founded, but it is one about which little

need be said. If there is an appearance of solidity in any part of the argument, it is that the Legislature have not power to authorize an application of another's property to a private purpose, even on compensation made, because there is no express constitutional affirmance of such a power. But who can point out an express constitutional dissaffirmance of it? The clause by which it is declared, that no man's property shall be taken or applied to public use without the consent of his representatives, and without just compensation made, is a disabling, not an enabling, one; and the right would have existed in full force without it. Whether the power was only partially restrained for a reason similar to that which induced an ancient law-giver to annex no penalty to parricide, or whether it was thought there would be no temptation to the act of taking the property of an individual for another's use, it seems clear, that there is nothing in the constitution to prevent it, and the practice of the Legislature has been in accordance with the principle of which the application of another's ground to the purpose of a private way is a pregnant proof. It is true, that the title of the owner is not divested by it, but, in the language of the constitution, the ground is nevertheless ' applied ' to private use. It is also true, that it has usually, perhaps always, been so applied on compensation made; but this has been done from a sense of justice, and not of constitutional obligation. But, as in the case of the statute for compromising the dispute with the Connecticut claimants, under which the property of one man was taken from him and given to another for the sake of peace, the end to be attained by this lateral railroad law, is the public prosperity. Pennsylvania has an incalculable interest in her coal mines, nor will it be alleged, that the incorporation of railroad companies for the development of her resources in this or any other particular would not be a measure of public utility, and it surely will not be imagined, that a privilege constitutionally given to an artificial person, would be less constitutionally given to a natural one."

In that case it appears, that on the 5th day of May, 1832, an act of assembly was passed authorizing the location and construction of lateral railroads connecting with the public

improvements, and prescribing the mode of obtaining the same. In pursuance thereof the defendant, Freeman Thomas, petitioned the court of common pleas for the appointment of viewers to ascertain the amount of damage Jameson Harvey would sustain by reason of the railroad, which Thomas proposed to make through his land. He made the road, and the Supreme Court said he had a right to do so, although he thereby took private property for private use.

In *Hays* v. *Risher*, 32 Pa. St., *supra*, it was held, that the lateral railroad acts are constitutional. In that case Risher located a railroad, twenty feet wide, from his "lands, mill, coal mines" *etc.*, "lying within three miles of the Monongahela river, over the intervening lands of James H. Hays, to the Monongahela slack-water navigation." On writ of error, Woodward, Judge, for the court, said:

"The truth is, when a lateral railroad is laid upon intervening lands, private property is not taken for private use, and there was no occasion for Judge Gibson's remark in *Harvey* v. *Thomas*, 10 Watts. 63, that the constitution does not forbid such taking. The private property is taken for public use,—for clear and definite objects of a public nature, which are of sufficient importance to attract the sanction of the sovereign. That an individual expects to gain thereby, and has private motives for risking the whole of the necessary investment, and acquires peculiar rights in the work, detracts not a whit from the public aspects of it. * * * It was found, as her public improvements penetrated the interior, that many productive mines and manufactories situated near them were still separated by the land of an unneighborly owner, which must be crossed or tonnage be lost to the public improvements. To compel such owners to admit a right of passage was not to take away from them a fair participation in the public improvements, and to compensate them for the land occupied was to do all they had a right to claim. They hold their land as every man does, subject to the call of the government." *Harvey* v. *Lloyd*, 3 Pa. St. 331; *Shoenberger* v. *Mulhollan*, 8 Pa. St. 134.

In the case cited from 32 N. J. Eq. 765, Dixon, Judge, said: "But it is insisted by the complainants, that the road which the National Docks Railway Company intends to construct

will be a private, and not a public, one; and to establish this they adduce the purposes of the corporators. But I think these purposes are foreign to the inquiry. The character of the road in this respect is dependent, not on the designs of its projectors, but on the terms of the law which governs it."

Said Judge Baldwin in *Bonaparte* v. *Railroad Co.* Baldw. 205: "A road or canal constructed by the public or a corporation is a public highway for the public benefit, if the public have a right of passage thereon by paying a reasonable, stipulated, uniform toll." Tested by this criterion, and it is the true one, there can be no doubt that every railroad built by a corporation organized under our general law becomes *ipso facto* a public road.

In *Coal Co.* v. *Coal Co.*, 37 Md., it appeared, that by the act governing the case it was declared, that the three persons named therein and such other persons, as might be associated with them in the manner therein provided, should be and were thereby incorporated and made a body politic by the name and style, *etc.;* "and the said company shall have all the privileges and rights necessary for carrying on the mining of coal and ores, and the manufacture of iron and fire-brick, and for transporting and marketing the produce of their mines, land, and manufactories, and shall have power to lease or purchase lands, mines, and furnaces, with their appurtenances, and to hold all such property, personal, real, and mixed, as they may require for the purposes aforesaid," *etc.;* and it was by statute also invested " with all and singular the rights, profits, powers, authorities, immunities, and advantages for the surveying, locating and constructing a railroad, with the necessary appurtenances, from their mines or works, to connect with any convenient point or points, with other existing railroads in Alleghany county, or with the Chesapeake & Ohio canal at Cumberland," in the same manner as has been given and delegated to the Baltimore & Ohio Railroad Company, which includes the full and ample power of condemnation for right of way. By the same section it is made the duty of the company to " carry all persons and property at the same rates of tolls and prices of transportation as the Baltimore & Ohio Railroad Company are or shall be by law allowed to charge and receive."

On appeal, Alvey, Judge, for the court, said: "Without the facility of transportation from the mines by railroads, there would be little or no inducement to the investment of capital, and but small progress could be made in developing the vast mineral wealth of the State, in which the public at large are interested. To furnish the requisite facilities for the construction of railroads for the successful operation of the mines is therefore in some sense a public necessity, and, that being so, the use of the ways of such roads may well be said to be public, and therefore the right of condemnation exists; that the right should be placed in the hands and under the control of a private corporation, detracts nothing from the public nature of the use."

In *Getz's Appeal*, (Supreme Court of Pennsylvania,) 3 Amer. & Eng. R. Cas. 186, it was held, that the grant to construct a railroad carries with it by necessary implication the right to construct all works and appendages usual in the convenient operation of a railroad; that sidings are among such works. It was further held, that the Philadelphia & Reading Railroad Company by virtue of the general railroad law is authorized to construct sidings leading to manufacturing or mining establishments held by private owners, and for this purpose may take by virtue of the delegated power of eminent domain in it reposed the interjacent lands belonging to the other parties; that the right of running sidings to such private establishments and of taking the necessary lands for the purpose is clearly within the constitutional power of the Legislature to confer, because the public interest is thereby subserved by reason of the increased facilities afforded for developing the resources of the State and promoting the general wealth and prosperity of the community." Trunkey, Judge, dissented.

In *Reeves* v. *Treasurer*, 8 Ohio St. 333, it was held, that "the act of May 1, 1854, 'authorizing the trustees of townships to establish water-courses,' *etc.*, and the amendatory act of April 14, 1857, are in contravention of the nineteenth section of the bill of rights, inasmuch as they authorize an appropriation of private property without reference to the public welfare."

It has been held in New York, that the use of lands for

rural cemetery associations is private not public; and that the provisions of the New York statute authorizing the taking of lands for purposes of such associations by proceedings *in invitum* is unconstitutional and void, reversing the same case in 5 Hun 482; *In re Association*, 66 N. Y. 569.

In *Gilmer* v. *Lime Point*, 18 Cal. 229, "public use " is defined to be " a use which concerns the whole community as distinguished from a particular individual." But it is not necessary, that each and every individual member of society should have the same degree of interest in this use or be personally or directly affected by it, in order to make it public. If the use for which the property is taken be to satisfy a great public want or public exigency, it is a public use in the meaning of the constitution. This Court has said, that, to authorize the exercise of the right of eminent domain, the use, which the public is to have of such property, must be fixed and definite. The general public must have a right to a certain definite use of the private property on terms and for charges fixed by law, and the owner of the property must be compelled by law to permit the general public to enjoy it. It will not suffice, that the general prosperity of the community is promoted by the taking of private property from the owner and transferring its title and control to another or to a corporation, to be used by such other or by such corporation as private property uncontrolled by law as to its use. Such supposed indirect advantage to the community is not in contemplation of law a public use. The use of the property, which in such cases the public must have, must be a substantially beneficial use, which is obviously needful for the public to have, and without which the public would suffer great loss or inconvenience. *Varner* v. *Martin*, 21 W. Va. 534.

Section 44, ch. 43, Code 1868, authorized any one owning timber or mineral land and desiring a subterranean or surface right of way by railroad or otherwise, under or through or over the land of another, for the purpose of mining for minerals, or conveying such timber or minerals to market *etc.*, to apply to a Circuit Court for condemnation proceedings. By the forty fifth section the report of the commissioner should not eb confirmed, " unless from such report,

and the evidence in the case, the court was of the opinion that the purpose for which the property was to be taken was of public utility," *etc.*

Under this chapter the Valley Salt Company filed its application to have condemned a subterranean right of way for a railroad under the lands of Maj. Brown and others. The Circuit Court condemned the way; the defendants obtained a writ of error. The judgment was reversed, and the proceedings dismissed. Judge Paull for the court after reviewing the evidence, said: "No sufficient public use is therefore made to appear to justify an interference with the rights of private property. To secure the possession and enjoyment of private property is one of the chief ends of all free governments, and hence the limitation found in our National and State constitutions to secure this object, and the safeguard thus provided in the supreme law may not be lightly or recklessly invaded." *Salt Co. v. Brown*, 7 W. Va. 191.

In the case *In re Railroad Co.*, 15 N. E. Rep. 429, the Court of Appeals of New York held, that a railroad, which does not connect with a highway, which can only be reached by passing over State or private lands, which can have no habitations along or any freight traffic over the road, whose sole business is to convey sight-seers along the Niagara river, and the season of whose operations is confined to four months in the year, is not such a railroad corporation as is contemplated by the general railroad act of 1850, and there is no such public use as to justify the exercise of eminent domain in its behalf. In its opinion the court quotes with approbation Cooley Const. Lim. 669: "That can only be considered such (public use) when the government is supplying its own needs, or is furnishing facilities for its citizens in regard to these matters of public necessity, which on account of their peculiar character, and the difficulty—perhaps impossibility—of making provisions for them otherwise, it is alike proper, useful, and needful for the public to provide." The court further says: "The fact that the road of the petitioner may enable the portion of the public who visit Niagara Falls more easily or more fully to gratify their curiosity, or that the road will be public in the sense that all

who desire will be entitled to be carried upon it, is not sufficient, we think, in view of the other necessary limitations, to make the enterprise a public one, so as to justify condemnation proceedings."

In *Coal Co.* v. *Railroad Co.*, 34 Fed. Rep. 386 (33 Am. & Eng. R. Cas. 104, note, decided March 26, 1888,) it was held, that "the Constitution of Colorado, art. XV, § 4, declaring all railroads to be public highways does not prevent the raising of the question as to the character of a railroad in a proceeding by it to condemn land. Article II, § 15 providing, that 'whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public.' The inquiry is not as to what the company was organized for, or whether it will be a private or public corporation, but what the road will be, the structure itself, if any such thing will be made." The court further said: "It may be that this provision of the constitution was inserted with a view to remove the presumption, which is here referred to, or perhaps to allay all doubts which might arise at any time in respect to the question; but it is certainly true, that the provision of the constitution is only a declaration of the law as it stood at the time the constitution was made." Hallett, Judge, refers in his opinion to a case, I have not seen, decided in his court, (*McPhee et al.* v. *Union Pac. Ry. Co.*, not reported,) in which it was held, that a track which the company proposed to lay down in a town was only a private road for serving certain warehouses, not of a public character, which would enable them to proceed in opposition to the demands of certain property-holders in the neighborhood.

In *Railroad Co.* v. *Wiltse*, 6 N. E. Rep. 49, (decided by the Supreme Court of Illinois in 1886,) it was held, that, where the track, for which the appellant sought to condemn appellee's land, was a branch-road intended for the private use of handling the freight of certain brick-works, the condemnation of the property for such a use is unauthorized by law, and the proceedings should have been dismissed as soon

as such purpose became apparent. Shope, Judge, for the court said :

" It is evident from the evidence in this case, that the sole use and purpose of the proposed track was to reach the brick-works, situated between a half and three quarters of a mile from appellant's railroad, and thereby create a feeder to its main line, and add to the volume of its freights. There is no pretense, that there was any necessity for any increased facilities in the locality of the proposed track, except for the purpose of saving the hauling of brick from these brick-works, and the increased traffic brought to appellant's main line by the building of this spur. True, the superintendent says the track could be used to store cars upon ; but it is in the country, and there is no pretense, that there is or will be any necessity for or that it will be convenient to store cars at this point, or that the track was intended for such use. Besides, the track is shown to be designed for use by running cars over it each day. Indeed, so patent is it from the record, that the proposed track was a spur road, intended for the use indicated, that the only statement by appellant's counsel in his brief of the use for which appellee's land was to be appropriated, is as follows : ' The appellee being the owner of some land located between the railroad and the brick-works, appellant filed his petition to condemn a strip thirty feet in width across his land, in order to build a railroad track from its main track to the brick-works as described.' * * * If this was a side track, and was in some way necessary to or aided in the convenient and successful operation of appellant's railroad, the fact that it serves the private use men · tioned would not, as said by the court in *Railroad Co.* v. *Dix*, 109 Ill. 237, make it any the less necessary as a side track ; but there is no such pretense here, and the right to condemn appellee's land depends upon the right of appellant to build an independent branch-road from its main line to the brick-works, for the purpose of creating a feeder to its main line of road, or, as put by counsel, to move this vast volume of freight. In no just sense can this proposed line be said to be connected with or necessary to the building, operating or running of appellant's railroad."

In *Getz's Appeal, supra,* Trunkey, Judge, in a vigorous

dissenting opinion, said, (3 Am. & Eng. R. Cas. 195:) "No one denies that a railroad company may lay as many sidings and turnouts as are fairly requisite to accommodate its business, nor that the company is intrusted with the location of its road and branches, keeping within the limits of its charter. Locating its road between certain points, or locating a branch to a certain point for accommodation of the public, is altogether different from locating a branch or siding merely to accommodate a private person, natural or artificial, for private gain. Here is a naked fact of running a siding, as it is called, across the plaintiffs' lot, against their will, for private gain, to a rolling-mill. This siding is for public use. Its terminus is on private property. If the defendant may lawfully construct it, it may arbitrarily run its sidings to every private place it chooses, doing irreparable mischief to owners of property who are in the way. In Reading, the plaintiffs' dwelling and business are destroyed to-day in laying a siding to an iron-mill; to-morrow another citizen may be ruined by a siding to an ice-house; another by one to a tannery; and so on indefinitely. Other companies have like powers as this defendant. In Philadelphia, dwellings may be demolished in running sidings to sugar refineries, shoe factories, shops, and sales-rooms, and other private places, at the arbitrary discretion of the several boards of directors. Outside of the cities no man's farm will be secure from a siding to a stone-quarry or other private place whose owner may be favored by the judgment of a board of directors. I am not convinced, that it was the Legislature's intent to grant such rights, and do not believe they have been granted. But if within the words of the statutes or charters, it seems to me gross violation of the citizen's right that his private property should be violently taken for private gain."

Thus we see the progress which has been made in Pennsylvania in favor of the extraordinary right claimed by corporations and persons against the private right of the citizen. First the legislative grant was justified in *Harvey* v. *Thomas*, *supra*, on the ground, that the constitution did not forbid it; and afterwards on the ground, that the use was public, although it is difficult to see where the general public could

be interested. It would seem, that the public would be quite as much interested in the issue of bonds to aid manufacturing companies, yet it is uniformly held, that a statute, which authorizes a town to issue its bonds in aid of the manufacturing enterprises of individuals, is void because the taxes necessary to pay the bonds would, if collected, be a transfer of the property of individuals to aid in the projects of gain and profits of others and not for a public use in the proper sense of that term. *Association* v. *Topeka*, 20 Wall. 656; *Cole* v. *La Grange*, 113 U. S. 1, 5 Sup. Ct. Rep. 416; *Iron-Works* v. *Town of Moundsville*, 11 W. Va. 1.

The property of railroad corporations, so far as concerns the ownership thereof, and the profit or gain to be made from the use thereof, is to all intents and purposes private property, although applied to a use in which the public have an interest. *Railroad Co.* v. *Railroad Co.*, 97 Ill. 506. Where railroad corporations seek by the exercise of the right of eminent domain to take private property for public use, the public is concerned; but as to their private interests—their property and profits—they stand as individuals or as mere private corporations, in which the public has no concern; and for such private interests the right of eminent domain can not be invoked.

Stripped of all the disguises thrown around the case of the petitioner, it plainly appears that its object is to condemn the land of the defendants for the purpose of enabling it to lay a siding, switch, branch-road or lateral work from the main track to the Wheeling Steel-Works, a few hundred feet distant, for the purpose, as stated in the original petition, "of transporting freights to and from said steel-works over the petitioner's said railroad." This clearly was for the private accommodation of both the railroad and steel-works, and to make the private business of both more profitable. This was not for a public, but was for a private, use, and the taking of the property under these circumstances would be the taking of private property for private use, which is clearly prohibited.

The learned counsel for defendant in error in his brief says: "No deadlier blow could be aimed at the industries of the State than that which this defendant asks the court

to deal." It seems to us, if railroad corporations were permitted *ad libitum* to do what this defendant in error asks to be done, "no deadlier blow could be dealt the private rights of the citizens." If the doctrine claimed by defendant in error should prevail, then corporations might go to any private place they chose, to rolling-mills, ice-houses, tanneries, sugar-refineries, brick-yards, grocery-stores *etc.*, and in the country to stone-quarries, coal-mines, stock-farms *etc.*, and, if any private citizen dared to stand in the way, violently wrest his property from him for their mere private gain. In such a state of affairs the so-called protection by the constitution of the rights of private property would by the arbitrary ruling of the courts be rendered nugatory and void. The mere declaration in a petition, that the property is to be appropriated to public use does not make it so; and evidence, that the public will have a right to use it, amounts to nothing in the face of the fact, that the only incentive to ask for the condemnation was a private gain, and it was apparent, that the general public had no interest in it.

We would do nothing to hinder the development of the State nor to cripple railroad companies in assisting such development, but at the same time we must protect the property-rights of the citizens. Whatever corporations may be entitled under a proper construction of the law they will receive; but they must not be permitted to take private property for private use.

The judgment of the Circuit Court is reversed, and the petition dismissed.

REVERSED. DISMISSED.