227 So.2d 1 (1969)
DIXIE PIPELINE COMPANY, Plaintiff-Appellee,
v.
Marguerite Kidder BARRY, Defendant-Appellant.
No. 2764.
Court of Appeal of Louisiana, Third Circuit.
September 16, 1969.
Dissenting Opinion September 19, 1969.
Rehearings Denied October 17, 1969.
Writ Refused January 9, 1970.
*3 J. Barry Mouton, Lafayette, for defendant-appellant.
John V. Parker, Baton Rouge, Andrew J. S. Jumonville, of Davidson, Meaux, Onebane & Donohoe, Lafayette, for plaintiff-appellee.
Before FRUGÉ, HOOD and MILLER, JJ.
MILLER, Judge.
Dixie Pipeline Company seeks to obtain a servitude for the construction and operation of a gas pipeline across Mrs. Marguerite Kidder Barry's property in St. Martin Parish. Defendant filed exceptions of prematurity and no right or cause of action, and an answer. The trial judge overruled the exceptions and rendered judgment on the merits in favor of plaintiff. Defendant has appealed.
This suit was consolidated for trial and appeal with two other expropriation suits filed by plaintiff involving tracts of land located near the Barry property. One of these suits was instituted against Amilcar J. Trosclair and the other against John A. Broussard. Substantially the same pleadings were filed and the same defenses were urged in all of these suits. Judgment was rendered by the trial court in favor of the plaintiff in each of those cases, and in each instance the defendant appealed. We are deciding all three of these companion cases on this date.[1]
Dixie Pipeline Company operates a system of pipe lines about 1300 miles long, extending from Texas into southeast Georgia and to North Carolina, and these pipelines are used exclusively to carry propane gas. Propane is used primarily for heating purposes and for fuel. The market or demand for that type gas varies with the weather or seasons. In cold weather, for instance, the demand is approximately six times as great as in the warmer summer months.
The company does not purchase or own the propane gas which it carries in its pipeline system. It accepts all propane gas tendered to it for transportation through its pipelines, provided that it will not accept a tender of gas for transportation unless the shipment consists of at least 7000 barrels per month. The tariff which it receives for transporting this gas is regulated *4 by schedules which are on file with the Interstate Commerce Commission.
The main pipeline operated by Dixie runs through St. Martin Parish, and a loading facility is maintained on that line near Breaux Bridge, Louisiana. Plaintiff proposes to construct an eight-inch pipeline from that loading facility near Breaux Bridge to a fractionation plant, sometimes referred to as a "promix plant," at Anse La Butte in St. Martin Parish. This plant is owned by Wanda Petroleum Company, Getty Oil Company and Placid Oil Company, and is operated by Wanda. The length of the proposed pipeline from the loading facility to the promix plant is 3.25 miles. These consolidated expropriation suits were filed to obtain a part of the servitude needed for this line. Servitudes have been obtained from all landowners along the proposed route, except the three landowners who are defendants in these suits.
The promix plant receives a "raw stream" gas from oil and gas fields in south Louisiana, and it separates the components of this mixture at the plant. The propane which is extracted is transported from the plant or from storage in a nearby salt dome cavern to the Dixie pipeline at its Breaux Bridge loading facility, and from that point is carried in Dixie's pipeline system to consumers in the southeast part of the United States. The present capacity of the promix plant is 25,000 barrels per day, but it is now being enlarged to increase its capacity to 50,000 barrels per day. The plant is connected to Dixie's main line by a four-inch pipeline owned by Wanda Petroleum Company. This existing four-inch line, however, will be inadequate to handle the increased flow of gas from the enlarged plant.
The eight-inch pipeline which Dixie proposes to lay, and for which the servitude here sought is needed, will run almost parallel to Wanda's existing four-inch line, along this entire distance of 3.25 miles.
Plaintiff seeks a permanent right of way, thirty feet wide, for the laying of this new pipeline, and a temporary servitude during construction of an additional 20 feet. The permanent and temporary servitudes which they seek herein overlap, or are superimposed over, two other existing servitudes on the three tracts of land which are involved in these suits. One of these existing servitudes is for the four-inch pipeline owned by Wanda Petroleum Company, and the other is for an electric transmission line owned and operated by SLEMCO. The Wanda Petroleum pipeline and the SLEMCO electric transmission line run generally parallel to each other, and they are about 20 feet apart. The pipeline which Dixie proposes to build runs between the Wanda pipeline and the SLEMCO electric transmission line for a part of the distance it traverses, and it runs very close to these lines for the rest of the distance across defendants' tracts.

Plea of Prematurity
Defendants contend, first, that plaintiff did not conduct bona fide negotiations with them in an effort to obtain the servitudes prior to filing these suits, and that all three suits should be dismissed as having been filed prematurely.
The evidence shows that prior to the institution of these expropriation proceedings, Mr. Lafolia Watts, an authorized representative of Dixie Pipeline Company, contacted each of the defendants and offered them the sum of $10.00 per rod for the servitudes. That is the amount which had been paid to and accepted by all other landowners along that route for similar servitudes. He also offered to at least two of the defendants the additional sum of $2.00 per rod for construction damages. Mr. Watts personally contacted each defendant, or at defendant's request, his attorney, and made several attempts to acquire these rights-of-way. The parties were unable to agree on a price, however, so these suits were filed.
*5 Defendants argue that the contacts made by Mr. Watts prior to institution of these suits, and the offer made by him to the defendant in each case, does not constitute a bona fide negotiation for the servitude because: (1) The amount offered was arbitrarily set by the expropriating authority for all of the defendants, without considering the market value and without a prior appraisal of each individual tract of land affected by the servitude; (2) comparable prior sales were not considered in determining the value of the servitude being expropriated; (3) no severance damages were considered or allowed; and (4) the initial offer made by plaintiff was not increased during the course of the negotiations.
An expropriation suit may be dismissed as being premature if the condemnor has not first negotiated with and been refused by the landowner. LSA-R.S. 19:2; Texas Gas Transmission Corporation v. Pierce, 192 So.2d 561 (La.App. 3d Cir. 1966). The requirement of negotiation before suit is met, however, when the expropriating authority makes a "good faith" attempt to acquire the property by conventional agreement prior to filing an expropriation suit. Evidence as to the amount which may have been offered to the landowner is material only insofar as it may have some bearing on the question of whether the condemnor was in good faith. There is no requirement that negotiations be conducted to a conclusion, or that the condemnor increase the initial offer which it made for the property. Forced arbitration in expropriation cases is not contemplated by our law, and it is not essential that a formal appraisal of the property or rights be made before suit is filed. The test to be applied in determining whether bona fide negotiations were conducted prior to suit is: Did condemnor make a "good faith" attempt to acquire the property or rights by conventional agreement before the expropriation suit was filed? See Central Louisiana Electric Company v. Brooks, 201 So.2d 679 (La.App. 3d Cir. 1967); Louisiana Power & Light Company v. Ristroph, 200 So.2d 14 (La.App. 1st Cir. 1967).
The offer made by Dixie to each defendant in these consolidated cases was substantial, it being the amount offered to and accepted by all other landowners along the route of the proposed pipeline. Mr. Watts discussed the matter with defendants and with their attorney on several occasions in an attempt to acquire a conventional right of way. We agree with the trial judge that plaintiff was in good faith, and that bona fide negotiations were conducted in an attempt to acquire these servitudes before suits were filed. We thus affirm that part of the trial court's judgment which rejects defendant's plea of prematurity in each case.

Authority of Plaintiff to Expropriate
Defendants contend next that Dixie Pipeline Company does not possess the power to expropriate because: (1) It is not a "public utility," since it is not subject to the general jurisdiction of the Louisiana Public Service Commission; and (2) it is not a "common carrier," in that it does not carry propane gas for "all people indifferently."
In LSA-R.S. 45:1161, a "public utility" is defined as any person, public or private, subject to the general jurisdiction of the Louisiana Public Service Commission. Defendants correctly point out that Dixie Pipeline Company is not subject to the jurisdiction of the Louisiana Public Service Commission, and for that reason they contend that it is not a public utility.
In Higginbotham v. Public Belt Railroad Commission, 181 So. 65 (La.App.Orl.Cir. 1938), the court held that "A common carrier is a carrier which undertakes to carry for all people indifferently." In the instant suits, defendants attach must significance to the fact that Dixie limits the use of its pipeline facilities to those customers who tender 7000 or more barrels of propane gas per month for transportation. They argue that since it does not carry for all people indifferently it is not a common carrier.
*6 LSA-R.S. 45:254 provides that all persons included in the definition of "common carrier pipelines" have the right to expropriate private property under the state expropriation laws. In LSA-R.S. 45:251 (1), however, a "common carrier" is defined as including all persons engaged in the transportation of petroleum "as public utilities and common carriers." Defendants, taking the position that Dixie Pipeline Company is neither a public utility nor a common carrier, argue that it thus does not have the right to expropriate. We cannot agree.
It is true that Dixie is not subject to the general jurisdiction of the Louisiana Public Service Commission, but the reason for that is that it is engaged in interstate commerce, and thus it is subject to the general jurisdiction of the Interstate Commerce Commission, rather than the Louisiana Public Service Commission. This circumstance, however, does not deprive it of its right to expropriate. Calcasieu & S. Ry. Co. v. Bel, 224 La. 269, 69 So.2d 40 (1953); Texas Gas Transmission Corporation v. Hebert, 207 So.2d 368 (La.App. 3d Cir. 1968); Texas Eastern Transmission Corporation v. Terzia, 138 So.2d 874 (La.App. 2d Cir. 1962).
In Texas Eastern Transmission Corporation v. Terzia, supra, our brothers of the Second Circuit Court of Appeal appropriately stated "* * * the right of expropriation is dependent not upon the public character and nature of the corporation but upon the public purposes and public interest which are served by such corporation."
In our opinion Dixie must be classified as a common carrier, as that term is defined in LSA-R.S. 45:251(1) and as it is used in LSA-R.S. 45:254, even though it is subject to the general jurisdiction of the Interstate Commerce Commission rather than the Louisiana Public Service Commission.
In support of their position that Dixie is not a common carrier because it refuses to accept a shipment of gas which consists of less than 7000 barrels per month from one shipper, defendants refer us to River & Rail Terminals v. Louisiana Ry. & Nav. Co., 171 La. 223, 130 So. 337 (1930), in which our Supreme Court said:
"It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public. * * *"
"Our conclusion is that the construction by defendant company of the spur track from its main line was for the purpose of serving an individual enterprise only and not for a public purpose."
We think a common carrier has, and must have, the right to make reasonable rules and regulations for the operation of its facilities, applicable to all shippers alike, without losing its status as a common carrier. 49 U.S.C.A. sec. 1(4), in fact, specifically requires common carriers by pipeline "to make reasonable rules and regulations with respect to their operation." All such rules and regulations must be filed with the Interstate Commerce Commission, and the Commission has authority to set aside any such regulation which it finds to be unjustly discriminatory. See 49 U.S.C.A. Sec. 15.
The testimony is to the effect that a minimum tender is customary for all pipelines carrying petroleum products of any type. The practice is similar to the railroad requirement of minimum carload lots (see S. Patti Construction Co. v. Union Pacific Railroad, 8 Cir., 170 F.2d 634) and is a matter which addresses itself to the regulatory agency having authority over the pipeline company.
The regulation imposed by Dixie that it would not accept a shipment for less than 7000 barrels per month from one shipper has been on file with the Interstate Commerce Commission. If these defendants or any parties contend that this is unjustly discriminatory, they have the right to bring *7 this matter before the Interstate Commerce Commission.
As observed by the trial judge, the right of a common carrier to regulate, limit or restrict its shipments, at least to some extent, is recognized by state statute. LSA-R.S. 45:259, for instance, provides that a carrier is not required to receive for shipment from any person in excess of 3000 barrels of petroleum in any one day.
We conclude, as did the trial judge, that the fact that Dixie Pipeline Company restricts its shipments to tenders of certain minimum amounts of propane does not deprive it of the right to be classified as a common carrier, and that under the provisions of LSA-R.S. 45:254 it has the right to expropriate under the general expropriation laws of this state.

Need for the Servitude
Defendants contend that plaintiff's proposed pipeline will not serve a general public purpose and that it is not needed. They argue: (1) That the proposed line will serve only private interests and a privately owned plant; and (2) that there is an existing four-inch pipeline between the plant and the Breaux Bridge loading facility which is adequate to serve the needs of plaintiff and the public.
While it is true that the proposed pipeline will connect a privately owned plant with plaintiff's pipeline, the effect of the new line will be to transport large quantities of propane gas from the plant to a large market in several states. Also, as we have already noted, the promix plant receives a "raw stream" from many producers in that area. The raw stream received from these producers is separated at the plant and the propane is then transported by means of pipelines to meet the demands of thousands of consumers. A large number of producers as well as many consumers will be benefited by the new facility.
In Texas Pipe Line Company v. Stein, 190 So.2d 244 (La.App. 4th Cir. 1966), the court said:
"It could hardly be argued seriously that a pipeline which distributed a product such as natural gas or fuel oil to 5,800 consumers in the general public from a single point of production would not be serving a public purpose. We can see no valid distinction between a distributing pipeline and one which serves 5,800 private producers, members of the general public, by transporting their crude product to a single refinery where it is converted into a consumable product. The only difference is the direction of the movement of the commodity through the pipeline."
Defendants point out that there is a privately owned salt dome cavern at or near the promix plant, in which large quantities of gas are stored by the owner until there is a market demand for it. Defendants argue that the sole purpose of the proposed pipeline is to convenience the owners of this storage facility by enabling them to keep the gas stored at this facility, at relatively low cost, until there is a market for it, and then to transport it in large quantities to the consumers when and as it is needed. They contend that the market demand can be supplied with the existing four-inch line by transporting the gas in smaller quantities each month throughout the year, and storing it at terminal points along the main pipeline. Such a procedure, of course, would be more expensive to the owners of the propane, and would result in substantial increases in cost to the consumer, but the public demand would nevertheless be served.
We agree with the trial judge's finding that there is no merit to the argument. The reason for storing the propane is to facilitate processing of the raw gas. Without such storage facilities the plant could not operate on a year round basis. Since the demand for propane is seasonal, the storage is just as essential as the plant.
*8 The interest of plaintiff is not in whether there is storage capacity at Breaux Bridge. Plaintiff must take its pipeline to the point where it has shippers who want to use its facilities. At this point it has 17 shippers with propane in such quantities that it is essential to plaintiff's operation that it construct this eight inch pipeline.
Our conclusion is that a public need for the proposed pipeline has been shown, and that plaintiff is entitled to the servitude which it seeks.

Quantum
Finally, defendants contend that the award made to each of them for the rights taken in each of these consolidated cases is inadequate and should be increased, and that the trial court erred in failing to award an additional sum to each defendant as severance damages.
The following amounts were awarded by the trial judge:

 To Mrs. Marguerite Kidder Barry:
 Permanent Servitude (.344 acres) $491.49
 Temporary Servitude (.2293 acres) 43.65
 _______
 Rounded total $535.00
 To Amilcar J. Trosclair
 Permanent Servitude (.18 acres) $257.17
 Temporary Servitude (.039 acres) 7.42
 _______
 Rounded total $265.00
 To John A. Broussard
 Permanent Servitude (.208 acres) $297.18
 Temporary Servitude (.1385 acres) 26.36
 _______
 Rounded total $325.00

Four appraisers testified at the trial, two of whom were called by plaintiff and two by the defendants. All agree that the subject properties were best suited for use as subdivision home sites to a depth of 400 feet from the highway on which each tract fronts. They valued the property with such a depth at amounts ranging from $25.00 to $35.00 per front foot. The trial judge found the value to be $35.00 per front foot, and he then computed the value per square foot. He concluded that the fee value of the land which is directly affected by the servitude had already been reduced by 50 percent because of the two previous servitudes affecting the same property, and he awarded 75 percent of the remaining fee value for the servitude.
We find no error in the reasoning of the trial judge, and we thus affirm the award as the value of the property taken.
The trial judge concluded that no severance damages were sustained by any of the defendants as a result of the taking. We find manifest error in this ruling.
There are two basic reasons for so holding: (1) Neither the trial court nor plaintiff's expert appraisers considered the fact that plaintiff has the right to change the size of the pipeline. According to the manager of Dixie Pipeline (Tr. 251) this will be necessary within ten years. This is likely to have an adverse effect on the market value of these country homesites. (2) The two experts for defendants were and have for years been active in buying and selling properties in the vicinity of defendants' properties. Neither of plaintiff's experts have bought or sold property in that vicinity, or is presently engaged in the business of buying or selling property. Furthermore, one of plaintiff's experts did *9 not assign any reason for his conclusion that "No severance damage is indicated."
As noted before, these properties are valued as rural homesite property from the highway frontage to a depth of 400 feet. The Dixie pipeline crosses the Barry tract about 350 feet from the highway; the Broussard tract, about 300 feet from the highway; and the Trosclair tract, along the highway frontage.
Maurice J. Chappuis, real estate appraiser for plaintiff, defined severance damages in his report as "the damage outside the servitude which arises by reason of the expropriation and by construction of the pipe line." He limited his discussion of this issue to the statement: "No severance damage is indicated." At trial, he testified that he had never engaged in the purchase or sale of real estate in the immediate vicinity of this property; that he has specialized in real estate appraisal work since 1962. There is not one word of testimony by Mr. Chappuis on the subject of severance damages. Since the expert's opinion must be supported with reasons, we can disregard his conclusion that "No severance damage is indicated." Experts may give opinions, but they must state the facts on which they are based. Brabo v. Martin, 5 La. 275 (1834). See also LSA-R.S. 15:465.
Allen J. Angers, realtor appraiser for plaintiff, defined severance damages "in the case of a partial taking, (as) the damage to the part not taken which arises (1) by reason of the taking and/or (2) the construction of the improvements in the manner proposed." On this issue, he stated in his three reports that:
"I have given consideration to the remainder property lying outside of the servitude area being sought after the the new pipeline had been installed. It was my conclusion that because the property is already bisected by an existing pipeline servitude, and an electric transmission line servitude, and further, because of the fact that the new servitude proposed will be located within the limits of the two existing servitudes, it is apparent that the highest and best use of the property outside of the two servitudes and the intensity of use for such purposes will not be affected by the installation of an additional pipeline in the servitude area. It was therefore my conclusion that no diminution in value will result to the property remaining outside of the servitude area itself which could represent a loss in value or severance damage due to the taking or the construction in the manner proposed."
Mr. Angers had never engaged in the purchase or sale of real estate in the Breaux Bridge area and has specialized in appraisal for the past nine months. When he first testified there was no mention of severance damages. After defendant's expert testified, Mr. Angers was called in rebuttal. He then stated that this expropriation did not cause severance damages to any properties owned by these defendants; that he had made "several studies in an attempt to gauge the impact of the pipeline or power lines on various types of property." Specifically he studied the Country Estates Subdivision (owned partly by defendant's expert Mr. Babineaux, and located in Lafayette Parish, near Carencro) from its acquisition as rural acreage through its conversion into a rural subdivision, which covered a two year period. He detailed his thorough study and presented a plat together with an overlay showing sales together with a chart summarizing the result. The Country Estates Subdivision was burdened with two pipelines at the time it was subdivided and a third pipeline was laid while lots were being sold.
Based on this thorough investigation of the records, but without having participated in the negotiations for or sale of one single lot, Mr. Angers summarized his finding at Tr. 444:
"So, it was my conclusion based on these facts that the property sold with no apparent resistance to the pipe line. It's *10 true that there may be some people who fear it, but the market is sufficiently large with other people who do not fear it or who are willing to ignore it and still purchase property."
In other parts of his testimony, Mr. Angers assigned the reasons set forth in his reports as support for his conclusion that there were no severance damages.
When the trial judge suggested that the addition of another pipeline would double the danger of explosion, Mr. Angers answered that "I suppose that you could say that would be true. I think I would agree that it probably would be true. BY THE COURT: Then should not that be a factor in considering severance damages? THE WITNESS: Yes, sir, and it's a factor that I've often considered. And I think that in some cases, I might apply it myself, if I were buying. But when I go out to examine sales of property, people don't distinguish between one line or two lines or three. They don'tthe seller's not willing to sell for less and the buyer's willing to pay the going price. So, if I could find it, I would certainly be the first to admit it. And I look for it everyday. But I have never yet found it."
It is quite clear from the record that Mr. Angers looked only at the properties and the recorded sales, for there is no suggestion that he attempted to buy or sell real estate in this area. On cross-examination, Mr. Angers admitted that he did not make a study on any rural subdivision similar to Country Estates, but which was not burdened with a pipeline. Since Mr. Angers is not in the business of buying or selling lots with or without pipelines, the value of his expert opinion based solely on a study of the records and the properties, is reduced. Many transactions of record may not necessarily present sales between a willing buyer and a willing seller. Some transactions may not show the true consideration.
Preston J. Babineaux and Jessie Guidry were accepted as expert appraisers for defendants. They submitted one report in which they defined severance damages in the identical words used by Mr. Angers. On the issue of severance damages, they stated:
"It is the expressed opinion of the appraiser(s) that due to the taking and the construction of the pipeline that severance damage exist. This is based on the appraisers experience in the buying and selling of property in St. Martin Parish, St. Landry Parish and Lafayette Parish.
"This is based on customer resistance due to fear, limitation of use of the property and the problem of developing the land due to the existence of the pipeline. Further, several investors, which this office handles, will not buy any property with a pipeline existing. Further based on the Federal Housing Authority and Veterans Administration, which the undersigned is a staff member, will not accept residence for financing within 300 feet from a pipeline."
Severance damages were calculated at 20% of the present value of the property. To determine present value, they appraised all three properties at $25 per front foot free of all servitudes. For the two existing rights of way (the single pole electric line, and the buried four inch propane pipeline), they reduced the value by 30%.
Applying this to the Barry tract, the 483 front feet gave a total value for the property (without servitudes) of $12,075. rounded to $12,000. By subtracting 30% for the existing two servitudes, the present value of the tract was appraised at $8,400. Twenty percent of that figure amounting to $1,680. rounded to $1,700., was their appraisal of the severance damages.
Applying this to the Broussard tract with 302 front feet, severance damages were appraised at $1,060. The Trosclair tract had 304 front feet, and severance damages were appraised at $1,100.
*11 Mr. Guidry did not testify, but was presented for cross-examination. Although he was not questioned concerning severance damages, his report explains his basis for concluding that severance damages were sustained by defendants.
Mr. Babineaux testified that he sells lots in the Dore subdivision located approximately one-half mile from defendant's properties; that he is in the business of subdividing properties, and frequently buys and sells lots in the Breaux Bridge area. In explaining problems he had with the Dore subdivision, he stated:
"And when I develoyed the property I had considerable loss due to having to either increase the lot size tremendously to be able to have a building area on it, and also in selling to the customers, there's a great sales resistance or pressure. Without the pipe line we'd have sold the lots, I feel, considerably faster. We get, let's say out of five customers, we'd get four that would reject and possibly one that would go. And what gauges damages or what creates value is your customers or your investors." (Tr. 417)
In addition Mr. Babineaux based his opinion on his experiences in developing other subdivisions where he had difficulty because of pipelines. One was the Country Estate Subdivision near Carencro. (Tr. 418) Another was the Cooley Bend Subdivision in Lafayette Parish. (Tr. 420) He admitted that some customers are not concerned with the proximity to pipelines, dump piles or glue factories. But he stated that the majority of customers do object to living next to a pipeline, which in turn requires a reduction in price. (Tr. 418) A further cause for severance damages is that the owner is prohibited from building permanent type structures on the line, which limits the use of the land.
Babineaux admitted that this pipeline would cause less damage to defendant's properties than was caused by the first two servitudes. (Tr. 423)
The trial court was in error in finding that Mr. Chappuis assigned reasons for his conclusion that "No severance damage is indicated." Further error is found in the trial court's finding that Mr. Babineaux based his opinion principally on his own experience in disposing of lots in the Country Estate Subdivision near Carencro. As a fact, Babineaux referred to two other named subdivisions and to his experience as an active working realtor. The trial court was greatly impressed, as was this court, with the excellent presentation by Mr. Angers which cast doubt on Babineaux's experience with reference to the Country Estates Subdivision. But Mr. Angers did not present similar studies on other subdivisions which Babineaux expressly referred to in defending his opinion.
More weight is assigned to an opinion based on the experience of buying and selling properties than to an opinion based on a study of the records and the properties. Furthermore, one of plaintiff's experts did not assign reasons for his conclusion.
We only recently held that installation of a second pipeline increased severance damages. Michigan Wisconsin Pipe Line Co. v. Bonin, 217 So.2d 741 (La.App. 3rd Cir. 1969). See also Trunkline Gas Company v. Verzwyvelt, 196 So.2d 58 (La.App. 3rd Cir. 1967); Veillon v. Columbia Gulf Transmission Company, 192 So.2d 646 (La. App. 3rd Cir. 1966).
The severance damages computed by defendants' experts are excessive. The first two servitudes have caused damage resulting from the fact that many purchasers will not purchase property burdened with a pipeline servitude; that the Federal Housing Authority and Veterans Administration will not finance homes built within 300 feet of a pipeline. Babineaux admitted that damage caused by this line is less than that caused by the first two servitudes. He and Guidry assigned a 30% loss of value to the first two servitudes. For this third servitude, we find severance *12 damages in the amount of 10% of the value of the property.
Using the $35 per front foot value of these properties, we find the following severance damages have been proved.
The Barry tract with 483 front feet has a total value (without servitudes) of $16,905. By subtracting 30% for the existing two servitudes, the present value of the tract is $11,833.50. Ten percent of this amount, or $1,183.35, is the amount of severance damages.
Applying this to the Broussard tract with 302 front feet, severance damages are $739.90. The severance damages to the Trosclair tract with 304 front feet, are $744.80.
The judgment of the trial court is amended to award additional damages to Mrs. Marguerite Kidder Barry in the amount of $1,183.35 as severance damages related to the taking of the 8-inch pipeline servitude. Defendant is entitled to interest at the rate of 5% per annum from December 18, 1968, until paid. The judgment is otherwise affirmed. Costs of this appeal are assessed to plaintiff-appellee.
Amended and affirmed.
HOOD, Judge (dissenting).
I agree with all of the conclusions reached by the majority except their holding that defendant is entitled to severance damages as a result of this taking.
The right of way taken in this instance is completely within the boundaries of two other overlapping servitudes. One is for another similar pipe line, and the other is for an electric transmission line. The pipe line which is to be constructed along the right of way being taken here will run almost parallel to, and within a very few feet of, the existing pipe line and electric transmission line.
Our law is settled that severance damages to the remaining property cannot be presumed. The burden of proof is upon the defendant landowner to establish the damage which he claims to his remaining property, and severance damages will not be awarded unless the owner shows by competent evidence that the value of his remaining property has been diminished by the taking. Texas Gas Transmission Corporation v. Young, 198 So.2d 453 (La.App. 3d Cir. 1967); State Through Department of Highways v. Reuter, 175 So.2d 316 (La. App. 4th Cir. 1965); Tennessee Gas Transmission Company v. Violet Trapping Company, 200 So.2d 428 (La.App. 1st Cir. 1967).
The measure of severance damages is the difference between the value of the landowner's remaining property immediately before and its value immediately after the expropriation. Texas Pipe Line Company v. Barbe, 229 La. 191, 85 So.2d 260 (1955); Livingston Parish Police Jury v. Burns, 204 So.2d 299 (La.App. 1st Cir. 1967).
In the instant suit the defendant landowner has failed to show that his remaining property will decrease in value as a result of the taking. On the contrary, I think the evidence is clear and positive to the effect that the value of his property will not be diminished or affected in any way by the construction of the second pipe line. This evidence consists of opinions expressed by experts to that effect, supported by actual sales of similar homesite property in that area. The evidence also shows that none of the defendant landowners in the companion cases will sustain severance damages as a result of the taking.
For these reasons I respectfully dissent from that portion of the majority decree on rehearing which allows an award for severance damages.
On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., and SAVOY, J., are of the opinion that a rehearing should be granted.
NOTES
[1] See Dixie Pipeline Company v. Trosclair, 227 So.2d 13 (No. 2765 on our docket), and Dixie Pipeline Company v. Broussard, 227 So.2d 13 (No. 2766 on our docket).