JERRY E. SMITH, Circuit Judge,
dissenting:
I respectfully disagree with the panel majority, because the taking of the May-euxs’ property was not for a public purpose. Although, in my view, it is not necessary to reach the issue of necessity— because the case can be resolved on the public purpose criterion alone — I express some reservations regarding the majority’s approach to that issue as well.
I.
Article I, § 4 of the Louisiana Constitution of 1974 provides extensive protection for property rights:
Every person has the right to acquire, own control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question.
La. Const, art. I, § 4 (emphasis added). “Article I, section four of our Constitution was intended to give far-reaching new protection the right of our citizens to own and control private property.... Its language goes beyond other state constitutions, including our 1921 Constitution, and the federal Constitution in limiting the power of government to regulate private property.” State v. 1971 Green GMC Van, 354 So.2d 479, 486 (La.1977) (quotation omitted). “ ‘[N]o other state constitution places such extensive limitations on the power and authority of government to regulate or expropriate private property.’” State v. Spooner, 520 So.2d 336, 362 (La.1988) (quoting Louis Jenkins, The Declaration of Rights, 21 Loy. L. Rev. 9, 19 (1975)). “[T]he rule is the protection of property rights and the exception is regulation of those rights, the burden of proof must shift from the owner to the regulator.” Id. at 366-67 (Dennis, J., concurring). The Mayeuxs’ claims must be viewed in light of these general principles.
A.
The condemnation of the Mayeuxs’ property violates the public purpose requirement of the Louisiana Constitution. Properly understood, the present case is controlled by the factually similar case of River & Rail Terminals, Inc. v. La. Ry. & Nav. Co., 171 La. 223, 130 So. 337, 340 (1930),[1] which held that “construction ... *370 of [a] spur track ... for the purpose of serving an individual enterprise only” is not “a public purpose.”
To show a public purpose, there must be a “general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public.” Id. Like the proposed spur track to the PetroUnited facility, the spur line in River & Rail would have served the facility of a single “private enterprise whose premises the public has no right to enter, but is prohibited from so doing.” Id. at 339. Only those firms that have signed contracts with PetroUnited and obtained its permission to use its facilities are allowed to use the terminal that the proposed Illinois Central spur would serve.
The factual similarities between River & Rail and the instant case are striking:
The evidence clearly shows that the spur track of defendant company serves no other enterprise but the New Orleans Refining Company, and that it was constructed solely for the purpose of enabling defendant company to handle tank cars shipped out by the refinery.
There is nothing in the record to show that the public has ever used the spur track of defendant company, or that defendant company’s spur track will accommodate a number of plants on the river front, and will be open to all other business enterprises, present and future, in the same vicinity. The evidence fails to establish, in our opinion, that the entire public has the right to use the spur track....
It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public....
Our conclusion is that the construction by defendant company of the spur track from its main line was for the purpose of serving an individual enterprise only and not for a public purpose.
Id. at 340.
River & Rail has not been overruled and remains good law, at least with respect to other factually similar cases. The Louisiana First Circuit Court of Appeal, in fact, has adopted the River & Rail standard as its general rule for public purpose claims.[2]
B.
The majority claims that to meet the requirement of “a general public right to a definite use of the property” spelled out in River & Rail, Illinois Central need only show that “the public [will] have a right to use the spur” itself — even if it has no right to use the PetroUnited terminal — and that “the spur will actually be available to multiple shippers.” Id.; Majority op. at 364. This approach fails for three reasons.
*371 1.
First and most importantly, under the majority’s interpretation, River & Rail itself would have had to be decided the other way. The defendant railroad in River & Rail was a common carrier, and the general public undeniably had a “right to a definite use” of its rail spurs, including that which connected its main line to the New Orleans Refinery Company property. River & Rail, 130 So. at 339. The River & Rail court took great pains to distinguish between the “general publicas] right to a definite use of the property” and mere benefits to “some portion of the public” that arise from “use by a private individual or corporation.” Id. at 340. The former, not the latter, is the criterion for public use.
This language in River & Rail contradicts the majority’s suggestion that a spur line connecting solely to a privately owned terminal to which the public lacks a right of access meets the test so long as the public has a right of access to the spur line (though not the terminal) and “the spur will actually be available to multiple shippers.” Majority op. at 364. Such availability might show that the construction of the spur “may prove beneficial or profitable to some portion of the public” — the standard of proof rejected by River & Rail — but it is not enough to show that there is “a general public right to a definite use of the property.” River & Rail, 130 So. at 340.
2.
Second, the majority’s interpretation fails because the cases that River & Rail cites in explication of the requirement “general public right to a definite use of the property” cut the other way. Id. at 340. In the passage at issue, the River & Rail court cited three decisions: Pittsburg, Wheeling & Ky. R.R. v. Benwood Iron-Works, 31 W.Va. 710, 8 S.E. 453 (1888); Atlanta, Stone Mountain & Lithonia R.R. v. Bradley, 141 Ga. 740, 81 S.E. 1104 (1914); and Kansas City, Shreveport & Gulf Ry. v. La. W.R.R., 116 La. 178, 40 So. 627 (1905). The first two of these cases directly contradict the majority’s claims, and the third does not address the question at hand.
In Pittsburg, the court held that a proposed condemnation to build a rail spur failed the public purpose test because it connected only to a single steel works owned by a private firm. 8 S.E. at 466-67. The court concluded that the fact that “the public will have a right to use” the rail spur itself “amounts to nothing in the face of the fact that the only incentive to ask for the condemnation was private gain.” Id. at 467. Access to the terminal, not to the rail spur, was the determining factor.
Similarly, in Atlanta, 81 S.E. at 1105, the court invalidated a condemnation undertaken “for the purpose of constructing a spur track from its main line merely to afford transportation facilities for the owners of an individual enterprise.” Here too, the railroad was a common carrier, and the general public had a right of access to all its rail lines, including the spur in question. Once again, the determining factor is the status of the enterprise to which the spur line connected, not the status of the spur line itself.[3]
3.
The third flaw in the majority’s approach is that it undermines the fundamental objective of the public purpose re *372 quirement: to ensure that condemnations serve the public as a whole and not merely narrow private interests. The “right” to use a rail spur that connects to only one terminal is utterly worthless to the general public if it does not also have a right to use the terminal itself. Such was the situation in both River & Rail and the present case.
The public’s theoretical right to use the spur line therefore cannot prevent the use of the eminent domain power to construct a line that is useless to the general public but of benefit to politically influential private parties. For this reason, the majority runs afoul of the public purpose requirement’s fundamental objective of preventing the abuse of the eminent domain power “for the purpose of serving an individual enterprise only.” River & Rail, 130 So. at 340.
The majority’s additional requirement that “the spur will actually be available to multiple shippers” does not vitiate the danger of abuse of the eminent domain power. Majority op. at 364. Any expropriation that benefits an individual private business is also likely to benefit its customers, in this case the shippers that contract to store goods at the PetroUnited terminal. The majority’s approach requires only that the business in question can show that “the spur will ... be available to multiple shippers;” it need not even show that the shippers will actually take advantage of this “availability.” Id. Such a weak restriction does little, if anything, to prevent the use of the eminent domain power for the benefit of narrow private interests.
C.
Several of Louisiana’s lower courts, cited by the district court and the majority, have sought to narrow the scope of River & Rail, but even those courts have reaffirmed its applicability to directly analogous factual circumstances.[4] Some other Louisiana lower courts have adopted broader standards for public purpose determinations, holding that almost any expropriation that promotes economic development or increases consumer access to the products of industry passes the test.[5] These *373 decisions, however, addressed factual circumstances very different from those of the present case and are easily distinguishable.[6] In any event, we are not bound by these later lower court decisions, because in diversity cases we are required “to apply the law as interpreted by the state’s highest court.” FDIC v. Abraham, 137 F.3d 264, 268 (5th Cir.1998) (emphasis added) (quotations omitted).
The majority claims that its holding is supported by several Louisiana Supreme Court decisions. The cases the majority cites, however, do not advance the conclusion that a spur line that connects to only one privately owned terminal can pass the public purpose test. To the contrary, all of these decisions upheld expropriation at issue in large part because the spur line in question connected to more than one terminal.
Kansas City, the first case on which the majority relies, is readily distinguishable and was in any event decided twenty-five years before River & Rail. The Kansas City court, 40 So. at 629, upheld a condemnation for the purpose of building a “spur track ... [that] will reach nine industrial plants already in existence.” Undeniably, a track that services the facilities of nine different firms is more likely to serve a true public purpose than is one that connects to just one facility owned by a single enterprise.
There is no indication that the Kansas City court would have upheld a condemnation of the latter type. To the contrary, that court favorably cited an Arkansas decision that “held that a railway cannot exercise the right of eminent domain to establish a private station for an individual shipper.” Id. (citing St. Louis, Iron Mountain & S. Ry. v. Petty, 57 Ark. 359, 21 S.W. 884 (1893)).[7]
Gumbel v. New Orleans Terminal Co., 186 La. 882, 173 So. 518 (1937), and Calcasieu & S. Ry. v. Bel, 224 La. 269, 69 So.2d 40 (1953), the two other cases relied on by the majority, are also distinguishable. Gumbel upheld the use of eminent domain to operate a spur track because “the tracks are not restricted to the use of any single industrial plant, but, on the contrary, are available to any industrial plant which may locate on any of the now vacant sites in the area; ... there are presently operating in the area three industrial plants which are served by the tracks, which, in the past, also served a number of other plants formerly located in this industrial area.” Id. at 521.[8] In the present *374 case, the proposed spur line connects only to a single enterprise, and there are no other enterprises to which it can connect, even potentially. The Gumbel court specifically distinguished River & Rail on the ground that “the spur track involved there, differently from the spur track involved here, was constructed solely for the purpose of serving a single industry.” Id.
In Calcasieu, likewise, the court upheld a condemnation for a spur line because the railroad had established that the proposed spur would connect not only to a single private facility but also to properties owned by “lumber corporations, owners of large tracts of land situated in the vicinity of the proposed rail line.” Calcasieu, 69 So.2d at 42. The court stressed that “upon completion of the railroad under construction, its facilities would serve the public generally and any industries located near its tracks.” Id.
Louisiana precedent may not definitively answer the question of how many privately owned terminals a proposed spur line has to connect to before it can be considered a public purpose. River & Rail does, however, plainly state that one is not enough.
There is, therefore, every reason to believe that River & Rail is the Louisiana precedent most applicable to the present case. We need not decide to what it extent it also may apply in situations that are materially different. For this reason, I would reverse the district court’s decision on the ground that the proposed expropriation is not for a public purpose.
II.
Because I conclude that the proposed condemnation of the Mayeuxs’ property runs afoul of the public purpose requirement, I do not consider it essential for this court to address the necessity issue. Assuming that the issue does have to be resolved, I agree with the majority’s conclusion that a remand is necessary. I write separately, however, to point out some critical flaws and omissions in the majority’s reasoning.
A.
The most important shortcoming of the majority opinion is its failure to give proper consideration to the fact that the Louisiana Constitution of 1974 imposes a new and more strict necessity requirement on takings by private entities. Under the 1921 Constitution, authorized private expropriators were required only to prove that the expropriation was for a public purpose. The 1974 Constitution imposes the additional requirement that takings by private entities must be for a “public and necessary purpose.” La. Const, art. I § 4 (emphasis added).
The only published opinion explicitly to have considered the impact of the 1974 Constitution on the necessity standard is Judge Watson’s concurring opinion in La. Resources, in which he concluded that art. I, § 4 of the 1974 Constitution “was adopted after great controversy and was intended to make expropriation by private entities more difficult.” Id. at 521 (Wat *375 son, J., concurring).[9] Judge Watson’s reasoning is persuasive: It is difficult to believe that the 1974 framers would have added the “necessary” provision if they had not intended to raise the applicable standard and to create a higher standard than that applied to public agencies.
Evidence gathered by academic commentators confirms Judge Watson’s view.[10] Louis Jenkins points out that “[t]he convention debated at length the desirability of providing that property could not be taken except for a ‘public and necessary’ purpose” and deliberately chose to adopt this wording to set a “considerably more onerous ” standard for takings by private entities. Jenkins, supra, 21 Loy. L. Rev. at 21-22 (emphasis added).
The Louisiana Supreme Court has refused to accept interpretations of the state Constitution that render particular provisions “superfluous.”[11] If the standard for necessity required of private expropriators is not held to be higher than that demanded of government agencies, the term “necessary” in Art. I, § 4 — which applies to private but not governmental takings — • would be rendered superfluous, because it would not create a higher standard for the former. In sum, the Louisiana Constitution of 1974 supports a standard of necessity for takings by private entities that is much more rigorous than that currently required of government agencies or that required of private expropriators before 1974.
B.
If we accept, as we must, the conclusion that the 1974 Constitution requires private expropriators to meet a standard of necessity that goes beyond the requirements imposed on public agencies, Illinois Central’s position becomes even more precarious than the majority indicates. A sound approach to the necessity standard should at the very least require that the public purpose the taking is intended to achieve cannot be accomplished with comparable efficacy without expropriation. This requirement is consonant with the current caselaw’s insistence that proof of necessity must include proof of the necessity of the purpose though not of the necessity of the specific location.[12] E'ven if the expropriator need not prove that the condemnation of any specific site is required, it still must prove that the expropriation of some location is necessary to achieve its public purposes. If the public purpose can be achieved by voluntary means, it cannot possibly be “necessary” to achieve it by means of coercive expropriation.[13]
This line of reasoning is supported by Coleman, one of the cases relied on by the *376 majority. Coleman held that “[o]nce public necessity is established, the extent and location for the property to be expropriated are within the sound discretion of the expropriation authority.” Coleman, 673 So.2d at 296 (emphasis added). This demonstrates that proof of “public necessity” is separate from proof of the need for any particular site. The expropriator first must establish that expropriation is necessary at all.
The requirement that expropriators prove that the public purpose at issue cannot be achieved without expropriation is stronger than the majority’s stated requirement that the expropriator merely prove the existence of a “public demand for the expropriation” and the “expediency” of expropriating the particular property at issue. Majority op. at 367. Here, the majority’s failure to acknowledge the importance of the 1974 Constitution comes home to roost. All but one of the cases that the majority cites to support its position that the existence of a “public demand” is sufficient to justify an expropriation once “expediency” is established either predate the 1974 Constitution or concern expropriation by public agencies — which are not bound by the necessity requirement of art. 1, § 4- — or both.[14] These cases are irrelevant to the task of interpreting art. 1, § 4.
Claiborne Electric, the sole post-1974 decision cited by the majority to support its position on this point, does not in fact do so. The Claiborne court held merely that the existence of a demand for the public purpose served by the expropriation refuted the property owners’ claim that the power company was required to prove the need to expropriate “the specific location of the servitude.” Claiborne, 357 So.2d at 1255 (emphasis added). Claiborne did not even come close to holding that the existence of a “public demand” obviates the need to prove that expropriation of some property is necessary.[15]
The majority’s approach might even allow the necessity standard to be satisfied in cases where some segment of “the public” — in this case, a segment as small as a few shippers — supports expropriation despite the fact that the public purpose in question could just as effectively be achieved by noncoercive means. The degree of danger posed by the majority position remains uncertain, however, because the majority fails to indicate how high a level of “public demand” needs to be demonstrated before its standard is met.
For the reasons indicated, I respectfully dissent.

. Although River & Rail was decided under the 1921 Louisiana Constitution rather than the 1974 Constitution, the two documents are alike in forbidding condemnations for nonpublic purposes. In view of the strong solicitude for property rights shown by the 1974 framers, it is safe to assume that the public purpose test under the 1974 Constitution is— at the very least — no less stringent than that under its predecessor. See W. Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 16-17 (1974) (demonstrating that “the deliberate aim [of art. 1, § 4 of the 1974 Constitution] was to make expropriation more difficult”); Jenkins, supra, 21 Loy. L. Rev. at 10 (noting *370 that "[l]he new Louisiana Constitution is the first state or national constitution to be influenced by modern libertarian writers” and that it reflects a “passion for strong limitations on the power of government and for both economic and social freedom”). Jenkins was a delegate to the Louisiana Constitutional Convention and co-author of the Declaration of Rights of which art. I, § 4 is a part.

. See Terrebonne Parish Police Jury v. Kelly, 472 So.2d 229, 232 (La.App. 1st Cir.) (holding that "to show a public purpose there must be a 'general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public’ ”) (quoting River & Rail, 130 So. at 340), writ granted in part on other grounds, 476 So.2d 340 (La.1985).

. Kansas City, the third case cited by the River & Rail court, does not shed light on the point at issue.

. The district court claims that later decisions have not "followed [the] restrictive line” of River & Rail, but the court cites only three decisions — all from the Louisiana Third Circuit — in support. Ill. Cent., 178 F.Supp.2d at 668 (citing Dixie Pipeline Co. v. Barry, 227 So.2d 1 (La.App. 3d Cir.1969), writ denied, 255 La. 145, 229 So.2d 731 (1970)); La. Res. Co. v. Greene, 406 So.2d 1360 (La.App. 3d Cir.1981), writ denied, 412 So.2d 84 (La.1982); Town of Vidalia v. Ruffin, 663 So.2d 315, 319 (La.App. 3d Cir.1995). One of the courts cited, however, took care to point out that River & Rail "reached the correct conclusion under the particular facts before it,” because the proposed spur track in that case would link only to a " 'private enterprise whose premises the public has no right to enter, but is prohibited from so doing.'" Id. at 319 n. 2 (quoting River & Rail, 130 So. at 339) (emphasis added by Ruffin). Thus, it seems likely that the Ruffin court would not have upheld the expropriation in the present case.
One of the other cited opinions similarly noted that River & Rail was correctly decided, because a rail spur "to the site of a private industrial plant [is not a public purpose] because the public had no right of access to this facility.” La. Res., 406 So.2d at 1364. The third case distinguished River & Rail on the ground that the facility in question — a pipeline — was a common carrier facility open to all customers that met generally applicable rules. Dixie Pipeline, 227 So.2d at 6. This distinction does not apply to the PetroUnited terminal.

. See City of Shreveport v. Chanse Gas Corp., 794 So.2d 962, 973 (La.App. 2d Cir.2001) (finding that "economic development is a public purpose”), writ denied, 805 So.2d 209 (La.), and writ denied, 805 So.2d 209 (La.2002); La. Res., 406 So.2d at 1364 (holding that a pipeline that provided gas only for selected private industries "serves a public purpose merely by placing more gas in the stream of commerce”).

. For example, the Louisiana Resources and Chanse Gas courts considered expropriations for the purpose of building pipelines for public utilities.

. The reasoning of the Arkansas Supreme Court strongly supports my position:
A railway cannot exercise the right of eminent domain to establish a private shipping station for an individual shipper. If the station is for the exclusive use of a single individual, or a collection of individuals less than the public, that stamps it as a private use, and private property cannot be taken for private use. The fact that the railway's business would be increased by the additional private facilities is not enough to make the use public.... To be public, the user must concern the public. If it is an aid in facilitating the business for which the public agency is authorized to exercise the power to condemn, or if the public may enjoy the use of it, not by permission, but of right, its character is public.
St. Louis, 21 S.W. at 885 (emphasis added).

.Citing Gumbel, the majority opines that "[i]t would be nonsensical to conclude that a public purpose exists when a spur serves three private companies operating from separate terminals, but that a public purpose does not exist when a spur serves dozens of companies shipping products from one terminal.” Majority op. at 367. Such a conclusion, though, is in fact perfectly reasonable. However many companies ship products to the one terminal, it is still the case that access to the terminal is controlled by a single private own *374 er, and only such parties as serve its interests will be allowed to use it. There is therefore no assurance that the spur line will be used for a public purpose beneficial to the public as a whole. By contrast, in the case with three terminals, access to stations on the spur line is no longer controlled by a single party, and there is at least somewhat greater assurance that the public interest will be served.
Furthermore, contrary to the majority's suggestion, Gumbel does not hold that a connection to three terminals is by itself sufficient to meet the River & Rail standard. Rather, it holds that this was sufficient in an area in which there also were empty lots that previously had contained numerous other industrial plants and might do so again. Gumbel, 173 So. at 521.

. The majority opinion in Stream did not address the issue raised by Judge Watson.

. See Hargrave, supra, 35 La. L.REvat 16-17 (demonstrating that "the deliberate aim [of art. I, § 4] was to make expropriation more difficult”); Jenkins, supra, 21 Loy. L. REV.at 21-22 (same).

. Manuel v. State, 692 So.2d 320, 324 (La.1996); see also City of Baton Rouge v. Ross, 654 So.2d 1311, 1328 (La.1995) (Calogero, C.J., concurring) (arguing that a provision of the 1974 Constitution that contained wording deliberately changed from that of the 1921 Constitution must not be interpreted in the same way as the latter, because otherwise the new wording would be superfluous).

. Coleman v. Chevron Pipe Line Co., 673 So.2d 291, 296 (La.App. 4th Cir.1996); Claiborne Elec. Coop. v. Garrett, 357 So.2d 1251, 1255 (La.App. 2d Cir.1978).

. The most relevant dictionary definition of necessary is a thing "that cannot be done without” or is "absolutely required.” Webster’s Third New International Dictionary 1151 (1986). Certainly, there can be no "absolute requirement” for expropriation if noncoercive alternatives are readily available.

. See Majority op. at 368 n. 41 (citing City of Westwego v. Marrero Land & Improvement Ass’n, 221 La. 564, 59 So.2d 885, 886 (1952) (both addressing a public expropriation and predating the 1974 Constitution); Southwestern Elec. Power Co. v. Conger, 254 So.2d 98, 99 (La.App. 2d Cir.1971) (predating 1974 Constitution); and Dixie Pipeline, 227 So.2d at 7 (same)).

. Indeed, the Claiborne court was careful to emphasize that the defendants were arguing that "the expropriating authority [must] prove [that] the particular route chosen [by the expropriator] was necessary.” Claiborne, 357 So.2d at 1255.