**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-30880

ILLINOIS CENTRAL RAILROAD COMPANY,

Plaintiff-Appellee,

VERSUS

JAMES E. MAYEUX; ET AL.,

Defendants,

JAMES E. MAYEUX and BARBARA RICHARD MAYEUX,

Defendants-Appellants.

JAMES E. MAYEUX and BARBARA RICHARD MAYEUX,

Plaintiffs-Appellants,

VERSUS

ILLINOIS CENTRAL RAILROAD COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
For the Middle District of Louisiana

August 1, 2002

Before REAVLEY, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Illinois Central Railroad Co. seeks to expropriate a strip of private property for the purpose of building a rail spur to a chemical storage facility on the Mississippi River. Under Louisiana law, a railroad company may expropriate private property only if it establishes a "public and necessary purpose" for the expropriation. The district court granted Illinois Central's motion for partial summary judgment on that issue, finding that the railroad established a public and necessary purpose as a matter of law. Because we find a genuine factual dispute over whether the expropriation serves a necessary purpose, we reverse and remand for further proceedings.

## I. Facts and Procedural History

Illinois Central is a common carrier railroad that operates a main line through Iberville Parish, Louisiana. In connection with its business, Illinois Central seeks to construct a rail spur from its main line to a chemical storage facility that is owned and operated by a French corporation named LBC PetroUnited, Inc. ("PetroUnited").

The PetroUnited facility is situated on the banks of the Mississippi River in St. Gabriel, Louisiana, approximately one mile west of the Illinois Central main line. The facility serves dozens

2

of chemical producers who store their chemicals at the facility until they can make arrangements to ship them elsewhere. The facility is currently accessible by barge and by truck. Illinois Central claims that making the facility rail-accessible would be advantageous for companies storing chemicals at the facility. The railroad also contends that shipping chemicals via rail is safer and more efficient than transporting them by truck or barge.

For the proposed spur to reach the PetroUnited facility, however, it must cross land belonging to the appellants, James and Barbara Mayeux. Despite the railroad's offers to purchase a servitude over the Mayeuxs' land, the Mayeuxs have been unwilling to sell.

After the Mayeuxs rejected its offers to purchase a servitude over the land, Illinois Central filed a complaint for expropriation in the Middle District of Louisiana. Illinois Central argued that, as a railroad corporation operating in Louisiana, it was entitled to expropriate a servitude over the Mayeuxs' land because the proposed spur would serve a public and necessary purpose under Louisiana law. On February 8, 2000, Illinois Central filed a motion for partial summary judgment on that issue. After hearing arguments from both sides, the district court granted the railroad's motion. On June 6, 2001, the case proceeded to a bench trial in which the district court awarded $180,429.00 to the Mayeuxs as "just compensation" for the taking. The Mayeuxs now appeal from the district court's judgment arguing that there was no

3

right to expropriate because the proposed spur serves neither a public nor a necessary purpose.

## II.  Discussion

### A.  Standard of Review[1]

We review grants of summary judgment de novo.[2]  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3]  An issue is material if its resolution could affect the outcome of the case.[4]  In deciding whether a fact issue has been created, we view the facts and the inferences to be drawn

---

[1] The district court applied a more lenient standard of review on the ground that the case was set for a bench trial.  Although prior panels of this court have entertained the idea of applying a more lenient standard in nonjury trials, this circuit has not actually adopted such a standard.  See, e.g., United States Fid. & Guar. Co. v. Planters Bank & Trust Co., 77 F.3d 863, 866 (5th Cir. 1996); Phillips Oil Co. v. OKC Corp., 812 F.2d 265, 273 n.15 (5th Cir. 1986).  Under the suggested more lenient standard, the district judge could grant summary judgment based on inferences drawn from incontrovertibly proven facts, so long as there is no issue of witness credibility.  United States Fid. & Guar., 77 F.3d at 866.  Because we determine that the Mayeuxs have controverted a material issue of fact, we need not consider whether the more lenient standard is appropriate in this context.

[2] Mongrue v. Monsanto Co., 249 F.3d 422 (5th Cir. 2001).

[3] Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[4] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

4

from them in the light most favorable to the nonmoving party.[5] Since this diversity case involves solely questions of Louisiana expropriation law, we must apply the state law in an attempt to rule as the Louisiana Supreme Court would if presented with the same issues.[6]

**B.  Public and Necessary Purpose**

Under Louisiana Revised Statute § 19:2(2), "[a]ny domestic or foreign corporation created for the construction of railroads" may expropriate "needed" private property when the owner of the property and the corporation cannot agree upon a purchase price.[7] A second provision, Louisiana Revised Statute § 45:353, allows foreign railroad companies operating in Louisiana to expropriate property needed to construct railroads and rail spurs and for other "railroad purposes."[8]  Both of these statutes are, however, subject to the state constitutional protections afforded to owners of private property.  Article I, Section 4 of the Louisiana Constitution specifically provides that "[p]roperty shall not be taken or damaged by any private entity authorized by law to

---

[5] Hotard v. State Farm Fire & Cas. Co., 286 F.3d 814, 817 (5th Cir. 2002).

[6] Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938); Musser Davis Land Co. v. Union Pac. Res., 201 F.3d 561, 563 (5th Cir. 2000).

[7] La. Rev. Stat. Ann. § 19:2(2) (West 1979 & Supp. 2002).

[8] La. Rev. Stat. Ann. § 45:353 (West 1982).

expropriate, except for a <u>public and necessary purpose</u> and with just compensation to the owner."[9]  The Louisiana Constitution also makes clear that, in a given expropriation case, whether "the purpose is public and necessary is a judicial question."[10]

### 1.  <u>Public Purpose</u>

Whether a particular expropriation will serve a public purpose is a two-pronged inquiry.[11]  Under the first prong, the expropriating corporation must show that there is a public right to use the expropriated property (i.e., the right of way for the rail spur).[12]  This prong consists of two subparts.[13]  Not only must the public have the right to use the spur, but there must also exist a possibility that more than one particular user will have access to the spur.[14]  Under the second prong, the court considers whether the expropriation will contribute to the general welfare of the

---

[9] La. Const. art. I, § 4 (West 1996) (emphasis added).

[10] <u>Id.</u>; <u>accord</u> <u>Calcasieu & S. Ry. Co. v. Bel</u>, 69 So. 2d 40, 41 (La. 1953).

[11] Melvin G. Dakin & Michael R. Klein, <u>Eminent Domain in Louisiana</u> 360 (1970).

[12] <u>Id.</u> (citing <u>Bel</u>, 69 So. 2d at 42; <u>Gumbel v. New Orleans Terminal Co.</u>, 173 So. 518, 521 (La. 1937); <u>Kansas City, S. & G. Ry. v. Louisiana W.R. Co.</u>, 40 So. 627, 629 (La. 1905)).

[13] <u>Id</u>.

[14] <u>Id.</u> at 361.

community.[15]

There is no question that the public will have the right to use the spur in this case. The fact that PetroUnited will initially "own" the spur[16] is inapposite; Louisiana courts have held that the financing and ownership arrangement for a proposed spur has no effect on whether the spur will serve a public purpose.[17] Because Illinois Central proposes to connect the spur to its main line, the spur is subject to regulation by the Louisiana Public Service Commission, and Illinois Central must use it to serve the public without discrimination.[18] Thus, the first subpart is satisfied.

---

[15] Id. (citing Texas E. Transmission Corp. v. Bowman, 115 So. 2d 797, 798-99 (La. 1959); Bel, 696 So. 2d at 43).

[16] At the time of summary judgment, PetroUnited and Illinois Central had come to a tentative financing agreement whereby PetroUnited would front the construction costs and maintain title over the spur for twenty years or until Illinois Central fully reimbursed PetroUnited, whichever came first.

[17] See, e.g., Bel, 69 So. 2d at 43 (the fact that the expropriating railroad's parent company, which was not a railroad company, was financing the construction of the proposed spur had no effect on the public purpose of the spur); see also S. Natural Gas Co. v. Poland, 384 So. 2d 528, 530 (La. Ct. App. 2d Cir. 1980) ("[W]e see no reason to prohibit expropriation of property because the eventual facility which will serve the public will not be solely owned by the expropriator. Where the law itself does not impose such a restriction on the power, we shall not impose the restriction.").

[18] La. Rev. Stat. Ann. § 45:1165 (West 1999); see also Dakin & Klein, supra note 11, at 361 ("[A]ll corporations endowed with the power of expropriation are public service corporations regulated by the Louisiana Public Service Commission and obligated by law to serve the public without discrimination.").

The second subpart concerns whether the spur will actually be available to multiple shippers. The Louisiana Supreme Court has made clear that in the context of railroad expropriation, the number of potential shippers is a key factor in establishing public purpose. In River & Rail Terminals, Inc. v. Louisiana Railway & Navigation Co., the Court held that a rail spur built to serve only one shipper was not built for a public purpose.[19] The railroad company in River & Rail had built a rail spur exclusively to serve the New Orleans Refining Company in the shipment of its own products.[20] Because the spur benefitted no shipper other than the one refining company, the court held that it did not serve a "public purpose."[21] The holding focused on the fact that the spur exclusively served one private shipper:

> The evidence clearly shows that the spur track of defendant company serves no other enterprise but the New Orleans Refining Company, and that it was constructed solely for the purpose of enabling defendant company to handle tank cars shipped out by the refinery.
> There is nothing in the record to show that the public has ever used the spur track of defendant company, or that defendant company's spur track will accommodate a number of plants on the river front, and will be open to all other business enterprises, present and future, in the same vicinity.[22]

Although one shipper is not enough, the proposed rail spur

_____

[19] 130 So. 337, 340 (La. 1930).

[20] Id. at 339-40.

[21] Id. at 340.

[22] Id.

8

does not have to serve a large number of shippers to serve a public purpose. In <u>Kansas City, S. & G. Railway Co. v. Louisiana Western Railroad Co.</u>, public purpose was established by showing that a spur would reach nine private industrial plants.[23] In <u>Gumbel v. New Orleans Terminal Co.</u>, a railroad company established a public purpose by showing that the rail spur would be open to the public and that it could potentially serve three private companies already operating in the area along the spur.[24] In <u>Calcasieu & Southern Railway Co. v. Bel</u>, the court held that public purpose was satisfied when a gravel company built a spur primarily to ship gravel from its own gravel pit.[25] The court found a public purpose because some of the land along the seven-mile rail spur belonged to lumber companies that might use the spur to ship lumber.[26]

The general public utility of a proposed rail spur also figures into the public purpose analysis. The <u>Bel</u> decision

---

[23] 40 So. 627, 629 (La. 1905).

[24] 173 So. 518, 521 (La. 1937) ("It is clear that the spur tracks involved here serve a public and not a mere private purpose. The uncontradicted testimony in the record shows that the tracks are not restricted to the use of any single industrial plant, but, on the contrary, are available to any industrial plant which may locate on any of the now vacant sites in the area; that there are presently operating in the area three industrial plants which are served by the tracks, which, in the past, also served a number of other plants formerly located in this industrial area."), <u>overruled in part by</u>, <u>Lake, Inc. v. La. Power & Light Co.</u>, 330 So. 2d 914, 918 (La. 1976).

[25] 69 So. 2d 40, 41 (La. 1953).

[26] <u>Id.</u> at 42-43.

demonstrates that after River & Rail, the Louisiana Supreme Court adopted a broader view of public purpose that encompasses the general public utility of a proposed expropriation. In determining that the gravel company's rail spur served a public purpose, the Bel court considered the economic benefits that the spur would bestow upon the general public:

> It was shown that . . . the construction of the road will be a public advantage and will tend to enlarge the resources, increase the industrial energies, and promote the productive powers of a considerable number of the inhabitants or businesses of a section of the state, and manifestly will contribute to the general welfare and prosperity of the community in which it is located.[27]

The court then referred with approval to a section of Nichols on Eminent Domain discussing the nationwide trend of interpreting public purpose broadly to mean public utility.[28] In the next paragraph, the court cited River & Rail, but stated that it is "not

---

[27] Id. at 43; accord City of New Orleans v. New Orleans Land Co., 136 So. 91, 92-93 (La. 1931) (citing Corpus Juris for the following: "The character of the use, and not its extent, determines the question of public use. It is not essential that the use or benefit extend to the whole public or any considerable portion thereof, nor that each and every individual member of the community have the same degree of interest therein.").

[28] Bel, 69 So. 2d at 43. Although the court did not indicate which edition of Nichols it was citing, the current edition of that treatise contains statements to the same effect. See 2A Julius L. Sackman, Nichols on Eminent Domain, § 7.02[5] (rev. 3d ed. 2001) ("Many courts have recognized the inadequacy of the narrow 'use by the general public' rule and have opted to follow the liberal construction of 'public use.'"); see also City of Shreveport v. Chanse Gas Corp., 794 So. 2d 962, 972-74 (La. Ct. App. 2d Cir. 2001) (acknowledging and adopting the federal trend in "public purpose" jurisprudence).

10

pertinent to, or determinative of, the issue in the instant case."[29] Having determined that the gravel company's rail spur was available to other shippers and that it would generally benefit the public, the court simply dismissed River & Rail as irrelevant to its analysis.[30]

Although PetroUnited is presently the only company with property adjacent to the proposed spur line, multiple shippers will have access to the spur. Consequently, this case is

_____

[29] Bel, 69 So. 2d at 43.

[30] Id. The more recent Louisiana appellate court cases define "public purpose" solely in terms of public benefit. See, e.g., Town of Vidalia v. Unopened Succession of Ruffin, 663 So. 2d 315, 319 (La. Ct. App. 3d Cir. 1995) ("[A]ny allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose."); Dixie Pipeline Co. v. Berry, 227 So. 2d 1, 7 (La. Ct. App. 3d Cir. 1969) (finding a public purpose where a proposed pipeline would connect a privately owned plant with the proposed expropriator's pipeline because "the effect of the pipeline will be to transport large quantities of propane gas from the plant to a large market in several states"), writ ref'd, 229 So. 2d 731 (La. 1970) ("On the facts found by the Court of Appeal the result is correct."); Texas Pipe Line Co. v. Stein, 190 So. 2d 244, 252 (La. Ct. App. 4th Cir. 1966), rev'd on other grounds as moot, 202 So. 2d 266 (La. 1967) ("The public purpose is no less served because the pipeline initially will deliver to only one consumer. If this were reason to reject its qualification as a public utility carrier, it would be very difficult, if not impossible, for any new common carrier pipeline for delivery of crude oil to a refinery to qualify, for we may fairly assume they are initially connected to only one refinery. It is not the number of persons who initially contract for use of the line, nor the number who might actually use it at any given time, which determines its public character, but rather the extent of the right to its use by the public."); see also Town of Vidalia, 663 So. 2d at 319 ("Despite this restrictive language [in River & Rail], the Louisiana jurisprudence has not defined 'public purpose' so narrowly."). We do not speculate, however, on whether the Louisiana Supreme Court would follow River & Rail today.

11

distinguishable from River & Rail.  PetroUnited is in the chemical storage and distribution business; it does not merely manufacture and ship its own products.  Rather, various companies deliver their products to the facility for storage until they make arrangements to ship them elsewhere.  The arrangement is one of bailment; at all times, PetroUnited's customers retain ownership of the products stored at the facility.  Thus, PetroUnited's customers decide when, where, and how to ship their products from the facility.

The summary judgment evidence indicates that from 1995 to 1999, PetroUnited's Sunshine facility stored chemicals for thirty-three different companies.  The evidence also shows that, on several occasions, various chemical companies asked Illinois Central to build a spur to the PetroUnited facility so that they could ship their chemicals via rail from that location.  Thus, unlike the spur in River & Rail, there is uncontroverted evidence that the rail spur in this case could serve numerous shipping companies and benefit the general public.  Since PetroUnited produces nothing, the only way that its facility generates a profit is by storing and facilitating the distribution and shipment of other companies' products.[31]

---

[31]  It is also relevant to note that River & Rail was a trespass suit, not a traditional expropriation suit.  The plaintiff in River & Rail sought to enjoin the defendant railroad company from operating a rail spur on the plaintiff's land without the plaintiff's permission or a court order.  River & Rail, 130 So. at 337-38.  That is, the railroad tortiously, and perhaps criminally, trespassed on the plaintiff's property to build and operate a rail line.  The railroad company raised expropriation as a defense to

Contrary to the dissent, our public purpose analysis does not conflict with the holding in River & Rail. We do not hold that a public purpose is established merely because the public will have a theoretical right to use the spur; the expropriator must also show that a sufficient number of shippers will have actual access to the spur. There was no public purpose in River & Rail because at the time of the lawsuit, only one shipper had access or occasion to use the spur.[32] In the present case, dozens of shippers will have access to the spur.

Furthermore, there is no basis for the dissent's claim that the general public must have access to the terminal served by the rail spur. Neither Kansas City, Gumbel, nor Bel involved public terminals. In each of these cases, public purpose was established by showing that the spur was open to the public and that several companies would actually have occasion to use it.[33] There is no

_____

the trespass suit after it had already been operating the rail spur for some time. Id. Although this fact does not overtly figure into the court's public purpose analysis, it provides relevant background from which to evaluate the case. Had the court simply required the railroad to compensate the landowners for the land that it had tortiously occupied, there would be no incentive for it (or others similarly situated) to negotiate with landowners or to bring expropriation suits before forcefully seizing land. Not only would that conclusion be inequitable under the facts of River & Rail, but it would undermine eminent domain law and breed bad public policy.

[32] Id. at 340.

[33] Kansas City, S. & G. Ry. Co. v. La. W. R.R. Co., 40 So. 627, 629 (La. 1905) (holding that a public purpose was established where "the proposed spur track of plaintiff company will reach nine industrial plants . . . and will be open to public use") (emphasis

13

indication in any of these cases that the public would have a right to use the private terminals that abutted the proposed spurs. Nor is there any indication that River & Rail requires that the rail terminal be open to the public.[34] The holding of River & Rail is simple: a spur built to serve one private shipper does not serve a public purpose. Neither it, nor the cases that it relied upon, require the spur to serve a public terminal.[35]

---

added); Gumbel v. New Orleans Terminal Co., 173 So. 518, 521 (La. 1937) ("It is clear that the spur tracks involved here serve a public and not a mere private purpose. The uncontradicted testimony in the record shows that the tracks are not restricted to the use of any single industrial plant, but, on the contrary, are available to any industrial plant which may locate on any of the now vacant sites in the area; that there are presently operating in the area three industrial plants which are served by the tracks . . . .") (emphasis added); Bel, 69 So. 2d at 42-43.

[34] See River & Rail, 130 So. at 340 (stating that "[t]here is nothing in the record to show that the public has ever used the spur track of defendant company, or that defendant company's spur track will accommodate a number of plants on the river front") (emphasis added).

[35] The court summarized its holding in River & Rail as follows: "Our conclusion is that the construction by the defendant company of the spur track from its main line was for the purpose of serving an individual enterprise only and not for a public purpose." Id. The cases that River & Rail relied on for its statement that "there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation" merely state that a spur built to serve one private shipper does not serve a public purpose. See Kansas City, 40 So. at 629 (acknowledging that there is no public purpose where the proposed spur would serve "a private station for an individual shipper"); Atlanta, S. M. & L. R. Co. v. Bradley, 81 S.E. 1104, 1105 (Ga. 1914) (holding that a spur serving only one shipper did not satisfy a public purpose); Pittsburg, W. & K. R. Co. v. Benwood Iron-Works, 8 S.E. 453, 455, 467 (W. Va. 1888) (holding that a public purpose was not established where the proposed spur would serve one steel factory). None of these cases hold that a proposed spur must serve a public terminal for it to serve a public purpose.

14

In <u>Gumbel</u>, for instance, public purpose was established because there were three private companies operating along the track that could use it for shipping products.[36]  It would be nonsensical to conclude that a public purpose exists when a spur serves three private companies operating from three private terminals, but that a public purpose does not exist when a spur serves dozens of companies shipping products from one terminal.

Thus, the public purpose requirement is satisfied in this case.  The undisputed evidence shows that the spur will be open to the public and that the dozens of companies who use the St. Gabriel facility will have access to the spur as a means of shipping their products through the region.  Summary judgment was therefore proper on the issue of public purpose.

2. <u>Necessary Purpose</u>

There are at least two components to the necessary purpose inquiry under Louisiana law.  First, the private expropriator must show that there is a public necessity for the expropriation; i.e., that there is a public demand for the expropriation.[37]  Second, the

---

[36] <u>Gumbel</u>, 173 So. at 521.

[37] <u>City of Westwego v. Marrero Land & Improvment Ass'n</u>, 59 So. 2d 885, 886 (La. 1952); <u>Claiborne Elec. Coop., Inc. v. Garrett</u>, 357 So. 2d 1251, 1255 (La. Ct. App. 2d Cir. 1978); <u>S.W. Elec. Power Co. v. Conger</u>, 254 So. 2d 98, 99 (La. Ct. App. 2d Cir. 1971); <u>Dixie Pipeline Co. v. Barry</u>, 227 So. 2d 1, 7 (La. Ct. App. 3d Cir. 1969); <u>see also</u> Dakin & Klein, <u>supra</u> note 11, at 363.
Academically, the public demand inquiry might fall under the heading of "public purpose" rather than "necessary purpose," but in

15

expropriator must show that the expropriation is expedient; i.e., "[t]he amount of land and the nature of the acreage taken must be reasonably necessary for the purpose of the expropriation . . . ."[38]

The district court erred in its necessary purpose analysis because it focused only on the expediency aspect of the inquiry. The court stated that the necessary purpose requirement is satisfied if the taking is for "railroad purposes,"[39] and emphasized that the expropriator need not "show actual, immediate, and impending necessity for the expropriation."[40] Since the Mayeuxs did not allege that Illinois Central was attempting to expropriate more property than was needed for the proposed spur, the court found that summary judgment was proper.

Before reaching the expediency issue, however, the court should have considered whether there was a public necessity for the spur. A key aspect of the public necessity inquiry under Louisiana expropriation law is whether there is an actual public demand for

---

deference to the weight of Louisiana decisions, which discuss the issue in terms of "necessity" and "public necessity," we have characterized it as an issue of necessary purpose.

[38] Coleman v. Chevron Pipe Line Co., 673 So. 2d 291, 296 (La. Ct. App. 4th Cir. 1996) (quoting City of New Orleans v. Moeglich, 126 So. 675, 677 (La. 1930)); accord Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot, 628 So. 2d 75, 78 (La. Ct. App. 3d Cir. 1993); see also Dakin & Klein, supra note 11, at 363 (characterizing the quantity and the location of the taking as "expediency issues").

[39] Mo. Pac. R.R. Co. v. Nicholson, 460 So. 2d 615, 620-21 (La. Ct. App. 1st Cir. 1984).

[40] Coleman, 673 So. 2d at 297 (quoting Moeglich, 126 So. at 677); accord Fontenot, 628 So. 2d at 78.

16

the expropriation.[41]  The court should have examined this issue and found a genuine issue of fact regarding the public demand for the proposed spur.  Illinois Central presented evidence of public demand for the spur by showing that certain chemical companies had directly petitioned the railroad to build a spur to this location. The Mayeuxs, however, presented expert testimony from a transportation and logistics specialist stating that there is no public demand for the proposed spur because it will be unattractive to companies in the business of shipping bulk chemicals.  The Mayeuxs' expert opined that the proposed spur will rarely, if ever, be used to ship chemicals from the Mississippi Valley.  Despite its relevance to the public demand or public necessity inquiry, the district court's summary judgment opinion makes no mention of this expert testimony.

Because the Mayeuxs have shown that there is a genuine dispute as to whether there is a public demand or public necessity for the spur, summary judgment on this material issue of fact was unwarranted.  On remand, the district court must determine whether there is a sufficient public demand for the proposed spur to

---

[41] City of Westwego, 59 So. 2d at 886 (considering evidence of the public demand for the expropriation before reviewing propriety of the proposed location); Claiborne Elec. Coop., 357 So. 2d at 1255 (evaluating the demand for the expropriation as part of the necessary purpose inquiry); Conger, 254 So. 2d at 99 (evaluating the public necessity (i.e., public demand) before discussing expediency issues); Dixie Pipeline, 227 So. 2d at 7; see also Dakin & Klein, supra note 11, at 363-65 (explaining that an expropriation must be necessary for a public benefit).

17

satisfy the necessary purpose requirement under Louisiana law.

### III.  Conclusion

Because there is a genuine factual dispute over whether there is a public necessity for the proposed spur, and summary judgment on the necessary purpose issue was improper, we therefore reverse the district court's judgment and remand the case for trial or other proceedings.

REVERSED and REMANDED for further proceedings.

JERRY E. SMITH, Circuit Judge, dissenting.

I respectfully disagree with the panel majority, because the taking of the Mayeuxs' property was not for a public purpose. Although, in my view, it is not necessary to reach the issue of necessitySSbecause the case can be resolved on the public purpose criterion aloneSSI express some reservations regarding the majority's approach to that issue as well.

## I.

Article I, § 4 of the Louisiana Constitution of 1974 provides extensive protection for property rights:

> Every person has the right to acquire, own control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. *Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner*; in such proceedings, whether the purpose is public and necessary shall be a judicial question.

LA. CONST. art. I, § 4 (emphasis added). "Article I, section four of our Constitution was intended to give far-reaching new protection the right of our citizens to own and control private property. . . . Its language goes beyond other state constitutions, including our 1921 Constitution, and the federal Constitution in limiting the power of government to regulate private property."

*State v. 1971 Green GMC Van*, 354 So. 2d 479, 486 (La. 1977) (quotation omitted). "'[N]o other state constitution places such extensive limitations on the power and authority of government to regulate or expropriate private property.'" *State v. Spooner*, 520 So. 2d 336, 362 (La. 1988) (quoting Louis Jenkins, *The Declaration of Rights*, 21 LOY. L. REV. 9, 19 (1975)). "[T]he rule is the protection of property rights and the exception is regulation of those rights, the burden of proof must shift from the owner to the regulator." *Id.* at 366-67 (Dennis, J., concurring). The Mayeuxs' claims must be viewed in light of these general principles.

### A.

The condemnation of the Mayeuxs' property violates the public purpose requirement of the Louisiana Constitution. Properly understood, the present case is controlled by the factually similar case of *River*

*& Rail Terminals, Inc. v. La. Ry. & Nav. Co.*, 130 So. 337, 340 (La. 1930),[42] which held that "construction . . . of [a] spur track . . . for the

---

[42] Although *River & Rail* was decided under the 1921 Louisiana Constitution rather than the 1974 Constitution, the two documents are alike in forbidding condemnations for non-public purposes. In view of the strong solicitude for property rights shown by the 1974 framers, it is safe to assume that the public purpose test under the 1974 Constitution isSSat the very leastSSno less stringent than that under its predecessor. *See* W. Lee Hargrave, *The Declaration of Rights of the Louisiana Constitution of 1974*, 35 LA. L. REV. 1, 16–17 (1974) (demonstrating that "the deliberate aim [of art. I, § 4 of the 1974 Constitution] was to make expropriation more difficult"); Jenkins, *supra*, 21 LOY. L. REV. at 10 (noting that "[t]he new Louisiana Constitution is the first state or national constitution to be influenced by modern libertarian writers" and that it reflects a "passion for strong limitations on the power of government and for both economic and social freedom"). Jenkins was a delegate to the Louisiana Constitutional Convention and co-author of the Declaration of Rights of which art. I, § 4 is a part.

20

purpose of serving an individual enterprise only" is not "a public purpose."

To show a public purpose, there must be a "general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public." *Id*. Like the proposed spur track to the PetroUnited facility, the spur line in *River & Rail* would have served the facility of a single "private enterprise whose premises the public has no right to enter, but is prohibited from so doing." *Id.* at 339. Only those firms that have signed contracts with PetroUnited and obtained its permission to use its facilities are allowed to use the terminal that the proposed Illinois Central spur would serve.

The factual similarities between *River & Rail* and the instant case are striking:

The evidence clearly shows that the spur track of defendant company serves no other enterprise but the New Orleans Refining Company, and that it was constructed solely for the purpose of enabling defendant company to handle tank cars shipped out by the refinery.

There is nothing in the record to show that the

21

public has ever used the spur track of defendant company, or that defendant company's spur track will accommodate a number of plants on the river front, and will be open to all other business enterprises, present and future, in the same vicinity. The evidence fails to establish, in our opinion, that the entire public has the right to use the spur track . . . .

It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public . . . .

Our conclusion is that the construction by defendant company of the spur track from its main line was for the purpose of serving an individual enterprise only and not for a public purpose.

*Id.* at 340.

*River & Rail* has not been overruled and remains good law, at least with respect to other factually similar cases. The Louisiana First Circuit Court of Appeal, in fact, has adopted the *River & Rail* standard as

22

its general rule for public purpose claims.[43]

### B.

The majority claims that to meet the requirement of "a general public right to a definite use of the property" spelled out in *River & Rail*, Illinois Central need only show that "the public [will] have a right to use the spur" itselfSSeven if it has no right to use the PetroUnited terminalSSand that "the spur will actually be available to multiple shippers." *Id.;* Majority op. at 8. This approach fails for three reasons.

### 1.

First and most importantly, under the majority's interpretation, *River & Rail* itself would have had to be decided the other way. The defendant railroad in *River & Rail* was a common carrier, and the general public undeniably had a "right to a definite use" of its rail spurs, including that which connected its main line to the New Orleans Refinery Company property. *River & Rail*, 130 So. at 339. The *River & Rail* court took great pains to distinguish between the "general

---

[43] *See Terrebonne Parish Police Jury v. Kelly*, 472 So. 2d 229, 232 (La. App. 1st Cir.) (holding that "to show a public purpose there must be a 'general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public'") (quoting *River & Rail*, 130 So. at 340), *writ granted in part on other grounds*, 476 So. 2d 340 (La. 1985).

public['s] right to a definite use of the property" and mere *benefits* to "some portion of the public" that arise from "use by a private individual or corporation." *Id.* at 340. The former, not the latter, is the criterion for public use.

This language in *River & Rail* contradicts the majority's suggestion that a spur line connecting solely to a privately owned terminal to which the public lacks a right of access meets the test so long as the public has a right of access to the spur line (though not the terminal) and "the spur will actually be available to multiple shippers." Majority op. at 8. Such availability might show that the construction of the

spur "may prove beneficial or profitable to some portion of the public"SSthe standard of proof rejected by *River & Rail*SSbut it is not enough to show that there is "a general public right to a definite use of the property." *River & Rail*, 130 So. at 340.

2.

Second, the majority's interpretation fails because the cases that *River & Rail* cites in explication of the requirement "general public right to a definite use of the property" cut the other way. *Id.* at 340. In the passage at issue, the *River & Rail* court cited three decisions: *Pittsburg, Wheeling & Ky. R.R. v. Benwood Iron-Works*, 8 S.E. 453 (W. Va. 1888); *Atlanta,*

24

*Stone Mountain & Lithonia R.R. v. Bradley*, 81 S.E. 1104 (Ga. 1914); and *Kansas City, Shreveport & Gulf Ry. v. La. W.R.R.*, 40 So. 627 (La. 1905). The first two of these cases directly contradict the majority's claims, and the third does not address the question at hand.

In *Pittsburg*, the court held that a proposed condemnation to build a rail spur failed the public purpose test because it connected only to a single steel works owned by a private firm. 8 S.E. at 466-67. The court concluded that the fact that "the public will have a right to use" the rail spur itself "amounts to nothing in the face of the fact that the only incentive to ask for the condemnation was private gain." *Id.* at 467. Access to the terminal, not to the rail spur, was the determining factor.

Similarly, in *Atlanta*, 81 S.E. at 1105, the court invalidated a condemnation undertaken "for the purpose of constructing a spur track from its main line merely to afford transportation facilities for the owners of an individual enterprise." Here too, the railroad was a common carrier, and the general public had a right of access to all its rail lines, including the spur in question. Once again, the determining factor is the status of the enterprise to which the spur line connected, not the status of the spur line

itself.[44]

### 3.

The third flaw in the majority's approach is that it undermines the fundamental objective of the public purpose requirement: to ensure that condemnations serve the public as a whole and not merely narrow private interests. The "right" to use a rail spur that connects to only one terminal is utterly worthless to the general public if it does not also have a right to use the terminal itself. Such was the situation in both *River & Rail* and the present case.

The public's theoretical right to use the spur line therefore cannot prevent the use of the eminent domain power to construct a line that is useless to the general public but of benefit to politically influential private parties. For this reason, the majority runs afoul of the public purpose requirement's fundamental objective of preventing the abuse of the eminent domain power "for the purpose of serving an individual enterprise only." *River & Rail*, 130 So. at 340.

The majority's additional requirement that "the spur will actually be available to multiple shippers" does not vitiate the danger of abuse of the eminent domain power. Majority op. at 8. Any expropriation that benefits an

---

[44]*Kansas City*, the third case cited by the *River & Rail* court, does not shed light on the point at issue.

individual private business is also likely to benefit its customers, in this case the shippers that contract to store goods at the PetroUnited terminal. The majority's approach requires only that the business in question can show that "the spur will . . . be *available* to multiple shippers;" it need not even show that the shippers will actually take advantage of this "availability." *Id.* Such a weak restriction does little, if anything, to prevent the use of the eminent domain power for the benefit of narrow private interests.

### C.

Several of Louisiana's lower courts, cited by the district court and the majority, have sought to narrow the scope of *River & Rail*, but even those courts have reaffirmed its applicability to directly analogous factual circumstances.[45]

---

[45] The district court claims that later decisions have not "followed [the] restrictive line" of *River & Rail*, but the court cites only three decisionsSSall from the Louisiana Third CircuitSSin support. *Ill. Cent.*, 178 F. Supp. 2d at 668 (citing *Dixie Pipeline Co. v. Barry*, 227 So. 2d 1 (La. App. 3d Cir. 1969), *writ denied*, 229 So. 2d 731 (La. 1970)); *La. Res. Co. v. Greene*, 406 So. 2d 1360 (La. App. 3d Cir. 1981), *writ denied*, 412 So. 2d 84 (La. 1982); *Town of Vidalia v. Ruffin*, 663 So. 2d 315, 319 (La. App. 3d Cir. 1995). One of the courts cited, however, took care to point out that *River & Rail* "reached the correct conclusion under the particular facts before it," because the proposed spur track in that case would link only to a "'*private enterprise whose premises the public has no right to enter, but is prohibited from so doing.*'" *Id.* at 319 n.2 (quoting *River & Rail*, 130 So. at 339) (emphasis added by *Ruffin*). Thus, it seems likely that the *Ruffin* court would not have upheld the expropriation in the present case.

27

Some other Louisiana lower courts have adopted broader standards for public purpose determinations, holding that almost any expropriation that promotes economic development or increases consumer access to the products of industry passes the test.[46]   These decisions, however, addressed factual circumstances very different from those of the present case and are easily distinguishable.[47]   In any event, we are not bound by these later lower court decisions, because in diversity cases we are required "to apply the law as interpreted by the state's *highest* court." *FDIC v. Abraham*, 137 F.3d 264, 268 (5th Cir. 1998) (emphasis added) (quotations omitted).

The majority claims that its holding is supported by several Louisiana Supreme Court

---

One of the other cited opinions similarly noted that *River & Rail* was correctly decided, because a rail spur "to the site of a private industrial plant [is not a public purpose] because the public had no right of access to this facility." *La. Res.*, 406 So.2d at 1364.  The third case distinguished *River & Rail* on the ground that the facility in questionSSa pipelineSSwas a common carrier facility open to all customers that met generally applicable rules. *Dixie Pipeline*, 227 So. 2d at 6.  This distinction does not apply to the PetroUnited terminal.

[46] *See City of Shreveport v. Chanse Gas Corp.*, 794 So. 2d 962, 973 (La. App. 2d Cir. 2001) (finding that "economic development is a public purpose"), *writ denied*, 805 So. 2d 209 (La.), *and writ denied*, 805 So. 2d 209 (La. 2002); *La.*

*Res.*, 406 So. 2d at 1364 (holding that a pipeline that provided gas only for selected private industries "serves a public purpose merely by placing more gas in the stream of commerce").

[47] For example, the *Louisiana Resources* and *Chanse Gas* courts considered expropriations for the purpose of building pipelines for public utilities.

decisions. The cases the majority cites, however, do not advance the conclusion that a spur line that connects to only one privately owned terminal can pass the public purpose test. To the contrary, all of these decisions upheld expropriation at issue in large part because the spur line in question connected to *more* than one terminal.

*Kansas City*, the first case on which the majority relies, is readily distinguishable and was in any event decided twenty-five years *before River & Rail*. The *Kansas City* court, 40 So. at 629, upheld a condemnation for the purpose of building a "spur track . . . [that] will reach nine industrial plants already in existence." Undeniably, a track that services the facilities of nine different firms is more likely to serve a true public purpose than is one that connects to just one facility owned by a single enterprise.

There is no indication that the *Kansas City* court would have upheld a condemnation of the latter type. To the contrary, that court favorably cited an Arkansas decision that "held that a railway cannot exercise the right of eminent domain to establish a private station for an individual shipper." *Id.* (citing *St. Louis, Iron Mountain & S. Ry. v. Petty*, 21 S.W. 884 (Ark. 1893)).[48]

---

[48]The reasoning of the Arkansas Supreme Court strongly supports my position:

A railway cannot exercise the right of eminent domain to establish a private shipping station for an individual shipper. If the station is for the exclusive use of a single individual, *or a collection of individuals less than the public, that stamps it as a private use, and private property cannot be taken for private use*. The fact that the railway's business would be increased by the additional private facilities is not enough to make the use public . . . . To be public, the user must concern the public. If it is an aid in facilitating the business for which the public agency is authorized

29

*Gumbel v. New Orleans Terminal Co.*, 173 So. 518 (La. 1937), and *Calcasieu & S. Ry. v. Bel*, 69 So. 2d 40 (La. 1953), the two other cases relied on by the majority, are also distinguishable. *Gumbel* upheld the use of eminent domain to operate a spur track because "the tracks are not restricted to the use of any single industrial plant, but, on the contrary, are available to any industrial plant which may locate on any of the now vacant sites in the area; . . . there are presently operating in the area three industrial plants which are served by the

to exercise the power to condemn, or *if the public may enjoy the use of it, not by permission, but of right*, its character is public.

*St. Louis*, 21 S.W. at 885 (emphasis added).

tracks, which, in the past, also served a number of other plants formerly located in this industrial area." *Id.* at 521.[49] In the present case,

---

[49] Citing *Gumbel*, the majority opines that "[i]t would be nonsensical to conclude that a public purpose exists when a spur serves three private companies operating from separate terminals, but that a public purpose does not exist when a spur serves dozens of companies shipping products from one terminal." Majority op. at 15. Such a conclusion, though, is in fact perfectly reasonable. However many companies ship products to the one terminal, it is still the case that access to the terminal is controlled by a single private owner, and only such parties as serve its interests will be allowed to use it. There is therefore no assurance that the spur line will be used for a public purpose beneficial to the public as a whole. By contrast, in the case with three terminals, access to stations on the spur line is no longer controlled by a single party, and there is at least somewhat greater assurance that the public interest will be served.

Furthermore, contrary to the majority's suggestion, *Gumbel*

30

the proposed spur line connects only to a single enterprise, and there are no other enterprises to which it can connect, even potentially. The *Gumbel* court specifically distinguished *River & Rail* on the ground that "the spur track involved there, differently from the spur track involved here, was constructed solely for the purpose of serving a single industry." *Id.*

In *Calcasieu,* likewise, the court upheld a condemnation for a spur line because the railroad had established that the

proposed spur would connect not only to a single private facility but also to properties owned by "lumber corporations, owners of large tracts of land situated in the vicinity of the proposed rail line." *Calcasieu*, 69 So. 2d at 42. The court stressed that "upon completion of the railroad under construction, its facilities would serve the public generally and any industries located near its tracks." *Id.*

Louisiana precedent may not definitively answer the question of how many privately owned terminals a proposed spur line has to connect to before it can be considered a public purpose. *River & Rail* does, however, plainly state that *one*

does not hold that a connection to three terminals is by itself sufficient to meet the *River & Rail* standard. Rather, it holds that this was sufficient in an area in which there also were empty lots that previously had contained numerous other industrial plants and might do so again. *Gumbel*, 173 So. at 521.

31

is not enough.

There is, therefore, every reason to believe that *River & Rail* is the Louisiana precedent most applicable to the present case. We need not decide to what it extent it also may apply in situations that are materially different. For this reason, I would reverse the district court's decision on the ground that the proposed expropriation is not for a public purpose.

## II.

Because I conclude that the proposed condemnation of the Mayeuxs' property runs afoul of the public purpose requirement, I do not consider it essential for this court to address the necessity issue. Assuming that the issue does have to be resolved, I agree with the majority's conclusion that a remand is necessary. I write separately, however, to point out some critical flaws and omissions in the majority's reasoning.

## A.

The most important shortcoming of the majority opinion is its failure to give proper consideration to the fact that the Louisiana Constitution of 1974 imposes a new and more strict necessity requirement on takings by private entities. Under the 1921 Constitution, authorized private expropriators were required only to prove that the expropriation was for a public purpose. The 1974 Constitution

32

imposes the additional requirement that takings by private entities must be for a "public *and necessary* purpose." La. Const. art. I § 4 (emphasis added).

The only published opinion explicitly to have considered the impact of the 1974 Constitution on the necessity standard is Judge Watson's concurring opinion in *La. Resources*, in which he concluded that art. I, § 4 of the 1974 Constitution "was adopted after great controversy and was intended to make expropriation by private entities more difficult." *Id.* at 521 (Watson, J., concurring).[50] Judge Watson's reasoning is

persuasive: It is difficult to believe that the 1974 framers would have added the "necessary" provision if they had not intended to raise the applicable standard and to create a higher standard than that applied to public agencies.

Evidence gathered by academic commentators confirms Judge Watson's view.[51] Louis Jenkins points out that "[t]he convention debated at length the desirability of providing that property could not be taken except for a 'public and necessary' purpose" and deliberately chose to adopt

---

[50] The majority opinion in *Stream* did not address the issue raised by Judge Watson.

[51] *See* Hargrave, *supra*, 35 La. L. Rev. at 16–17 (demonstrating that "the deliberate aim [of art. I, § 4] was to make expropriation more difficult"); Jenkins, *supra*, 21 Loy. L. Rev. at 21–22 (same).

this wording to set a "*considerably more onerous*" standard for takings by private entities. Jenkins, *supra*, 21 LOY. L. REV. at 21-22 (emphasis added).

The Louisiana Supreme Court has refused to accept interpretations of the state Constitution that render particular provisions "superfluous."[52] If the standard for necessity required of private expropriators is not held to be higher than that demanded of government agencies, the term "necessary" in Art. I, § 4SSwhich applies to private but not governmental takingsSSwould be rendered superfluous, because it would not create a higher standard for the former. In sum, the Louisiana Constitution of 1974 supports a standard of necessity for takings by private entities that is much more rigorous than that currently required of government agencies or that required of private expropriators before 1974.

## B.

If we accept, as we must, the conclusion that the 1974 Constitution requires private expropriators to meet a standard of necessity that goes beyond the requirements imposed

___

[52] *Manuel v. State*, 692 So. 2d 320, 324 (La. 1996); *see also City of Baton Rouge v. Ross*, 654 So. 2d 1311, 1328 (La. 1995) (Calogero, C.J., concurring) (arguing that a provision of the 1974 Constitution that contained wording deliberately changed from that of the 1921 Constitution must not be interpreted in the same way as the latter, because otherwise the new wording would be superfluous).

34

on public agencies, Illinois Central's position becomes even more precarious than the major- indicates. A sound approach to the necessity standard should at the very least require that the public purpose the taking is intended to achieve cannot be accomplished with comparable efficacy without expropriation. This requirement is consonant with the current caselaw's insistence that proof of necessity must include proof of the necessity of the purpose though not of the necessity of the specific location.[53] Even if the expropriator need not prove that the condemnation of any specific site is required, it still must prove that the expropriation of *some* location is necessary to achieve its public purposes. If the public purpose can be achieved by voluntary means, it cannot possibly be "*necessary*" to achieve it by means of coercive expropriation.[54]

This line of reasoning is supported by *Coleman*, one of the cases relied on by the majority. *Coleman* held that "*[o]nce public necessity is established*, the extent and location for the property to be

---

[53] *Coleman v. Chevron Pipe Line Co.*, 673 So. 2d 291, 296 (La. App. 4th Cir. 1996); *Claiborne Elec. Coop. v. Garrett*, 357 So. 2d 1251, 1255 (La. App. 2d Cir. 1978).

[54] The most relevant dictionary definition of necessary is a thing "that cannot be done without" or is "absolutely required." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1151 (1986). Certainly, there can be no "absolute requirement" for expropriation if noncoercive alternatives are readily available.

expropriated are within the sound discretion of the expropriation authority." *Coleman*, 673 So. 2d at 296 (emphasis added). This demonstrates that proof of "public necessity" is separate from proof of the need for any particular site. The expropriator first must establish that expropriation is necessary at all.

The requirement that expropriators prove that the public purpose at issue cannot be achieved without expropriation is stronger than the majority's stated requirement that the expropriator merely prove the existence of a "public demand for the expropriation" and the "expediency" of expropriating

the particular property at issue. Majority op. at 17. Here, the majority's failure to acknowledge the importance of the 1974 Constitution comes home to roost. All but one of the cases that the majority cites to support its position that the existence of a "public demand" is sufficient to justify an expropriation once "expediency" is established either predate the 1974 Constitution or concern expropriation by public agenciesSSwhich are not bound by the necessity requirement of art. 1, § 4SSor both.[55] These

---

[55]*See* Majority op. at 17 n.41 (citing *City of Westwego v. Marrero Land & Improvement Ass'n*, 59 So. 2d 885, 886 (La. 1952) (both addressing a public expropriation and predating the 1974 Constitution); *Southwestern Elec. Power Co. v. Conger*, 254 So. 2d 98, 99 (La. App. 2d Cir. 1971) (predating 1974 Constitution); and *Dixie*

cases are irrelevant to the task of interpreting art. 1, § 4.

*Claiborne Electric Power,* the sole post-1974 decision cited by the majority to support its position on this point, does not in fact do so. The *Claiborne* court held merely that the existence of a demand for the public purpose served by the expropriation refuted the property owners' claim that the power company was required to prove the need to expropriate "the *specific location* of the servitude." *Claiborne*, 357 So. 2d at 1255 (emphasis added). *Claiborne* did not even come close to holding that the existence of a

*Pipeline*, 227 So. 2d at 7 (same).

"public demand" obviates the need to prove that expropriation of *some* property is necessary.[56]

The majority's approach might even allow the necessity standard to be satisfied in cases where some segment of "the public"§§in this case, a segment as small as a few shippers §§supports expropriation despite the fact that the public purpose in question could just as effectively be achieved by noncoercive means. The degree of danger posed by the majority position remains uncertain,

[56]Indeed, the *Claiborne* court was careful to emphasize that the defendants were arguing that "the expropriating authority [must] prove [that] the particular route chosen [by the expropriator] was necessary." *Claiborne*, 357 So. 2d at 1255.

however, because the majority fails to indicate how high a level of "public demand" needs to be demonstrated before its standard is met.

   For the reasons indicated, I respectfully dissent.